**MERGENTIME CORPORATION, et al., Appellants/Cross–Appellees,**

v.

**WASHINGTON METROPOLITAN AREA TRANSIT AUTHORITY, et al., Appellees/Cross–Appellants.**

**Nos. 97–7138 to 97–7140.**

United States Court of Appeals, District of Columbia Circuit.

Argued Oct. 6, 1998.

Decided Feb. 16, 1999.

Philip Allen Lacovara argued the cause for appellant/cross-appellee Mergentime Corporation. With him on the briefs were Gary A. Orseck and Mark S. Davies.

Richard K. Willard argued the cause for appellant/cross-appellee Perini Corporation. With him on the briefs were Stephen A. Fennell, Brian J. Leske and John R. Keys, Jr. Robert S. Fischler entered an appearance.

W. Stanfield Johnson argued the cause for appellees/cross-appellants. With him on the briefs were George D. Ruttinger, Gerard J. Stief, Robert J. Kniaz and Robert L. Polk.

Before: HENDERSON, RANDOLPH and TATEL, Circuit Judges.

TATEL, Circuit Judge:

This case requires us to interpret Federal Rule of Civil Procedure 63, which applies when a district judge becomes unable to proceed and is replaced by a successor judge. The original judge in this case presided over a 45–day bench trial, during which the parties presented more than 50 witnesses and introduced more than 4,000 exhibits. Because the original judge became terminally ill after the close of evidence and could make only partial findings of fact and conclusions of law before he died, the successor judge faced two discrete tasks: adjudicating post-trial motions challenging the original judge's findings and conclusions, and making findings and conclusions of his own regarding the unresolved issues. Stating that he would not "second guess" the original judge's findings and conclusions, the successor judge refused to consider the parties' post-trial motions. Then, without allowing the parties to recall witnesses, the successor judge made further findings and conclusions from the record. Because we hold that the successor judge's

refusal to adjudicate post-trial motions and to consider recalling witnesses violated Rule 63, we reverse.

## I

In 1985, the Washington Metropolitan Area Transit Authority awarded a $50.9 million contract to build the Shaw Street station and associated tunnels on Metro's Green Line to a joint venture consisting of two construction companies, Mergentime Corporation and Perini Corporation, appellants in this case. WMATA soon awarded the joint venture a second contract to build the Green Line's U Street station and associated tunnels for $44.3 million. The contracts, which contained standard provisions governing contract modification, default termination, and dispute resolution, called for the completion of the Shaw Street work by March 1989 and the U Street work by August 1989.

From the outset, both projects experienced unexpected difficulties that caused substantial delays and cost overruns. For example, the Department of Public Works rejected the contractors' request to close Rhode Island Avenue (as WMATA's bid invitation had specified). This required significant changes in utility relocation plans that were important to the early stages of construction of the Shaw Street station. The contractors also encountered unanticipated soil conditions as they tunneled north from the Shaw Street station, requiring the use of time-consuming and expensive grouting techniques to stabilize the soil.

Invoking the "changes" clause of the contracts, the contractors submitted claims for equitable adjustments to the contract price seeking compensation for expenses resulting from these unforeseen problems. WMATA paid some of these claims, but slowly. By early 1988, the contractors were running a deficit of over $8.6 million on the Shaw Street project alone. To make matters worse, the contractors dissolved their joint venture at the end of 1987, though they did not immediately inform WMATA. Mergentime bought out Perini's interest for $1.5 million. This capital outlay, coupled with the fact that Perini was no longer making capital contributions to the project, worsened Mergentime's financial straits.

In April 1989, the contractors sued WMATA in the United States District Court for the District of Columbia, alleging that WMATA's failure to pay their claims for additional work constituted a breach of the Shaw Street contract. They sought $18.5 million in damages and a declaration that they had no obligation to continue working. In the meantime, work on the two projects slowed significantly. By the following summer, Mergentime had drastically reduced its workforce, falling weeks if not months behind schedule.

In an effort to rejuvenate the projects, the contractors and WMATA entered into a written agreement in August 1989, which, recognizing that most of the completion dates in the original contracts had passed, established revised "milestone" completion dates of September 1 and December 15, 1990 for Shaw Street and U Street, respectively. The contractors promised to use their "best efforts" to complete the projects by those dates in exchange for WMATA's promise to pay the contractors $4.4 million against their outstanding reimbursement claims and to use its "best efforts" to settle the remainder of those claims as promptly as possible. WMATA also agreed to relinquish any right to terminate the contract for default based on events that had occurred prior to the agreement. In return, the contractors agreed not to stop working based on prior events, including WMATA's failure to process their reimbursement claims. Apart from the reciprocal waivers of the right to terminate, the agreement expressly disclaimed any intent by the parties to relinquish their claims in the pending lawsuit, which the parties asked the district court to hold in abeyance.

Mergentime resumed work in September. It progressed satisfactorily for a few months, but by December work had once again slowed substantially. Mergentime complained to WMATA that because of its cash flow problems it would be unable to complete the work unless WMATA processed its outstanding reimbursement claims. In response, WMATA gave Mergentime an advance of $1 million in December 1989, and another advance of $1.6 million in February

1990. Although these advances briefly revitalized Mergentime's progress, each burst of energy was short-lived. By the spring of 1990, Mergentime had all but ceased working at both sites.

Asserting that the September and December 1990 milestone dates were no longer attainable, WMATA issued "show cause" letters to the contractors. (By then WMATA knew that the contractors had dissolved their joint venture, but it was not entirely clear whether Perini, which remains a party to this litigation, retained its obligations under the original contracts.) Responding to the show cause letters and continuing to insist that further progress hinged on the settlement of outstanding claims, Mergentime demanded an additional $7.9 million as a condition of returning to work. WMATA terminated the contracts for default on May 11, 1990.

Reviving their dormant lawsuit, the contractors added claims for breach of the U Street contract, breach of the August 1989 agreement, and wrongful termination. WMATA counterclaimed to recover so-called "excess reprocurement costs"—expenses incurred in hiring other contractors to complete the work covered by the contracts. During a 45–day bench trial, the parties presented over 50 witnesses and submitted over 4,000 exhibits.

Following the close of evidence, the district judge developed a terminal illness. As the illness worsened, he continued to work heroically, issuing a 251–page opinion containing partial findings of fact and conclusions of law in July 1993. Observing that "[t]his case is about how not to build a subway system," the judge held that WMATA justifiably terminated the contracts for default and was entitled to $16.5 million in excess reprocurement costs, that the contractors' Shaw Street reimbursement claims had "substantial, if not complete, merit," and that the contractors had failed to establish their entitlement to prove those claims with the beneficial "total cost" accounting method. *Mergentime Corp. v. WMATA*, No. 89–1055, at 1, 242, 247, 249 (D.D.C. July 30, 1993) ("July 1993 Order"). The judge said that he was unable to quantify the contractors' entitlement to reimbursement for its Shaw Street claims or to draw any conclusions regarding the merits of the contractors' U Street claims. *See id.* at 248–49. The judge died two days later.

After the case was reassigned to a successor judge, the contractors filed motions to amend the original judge's findings under Federal Rule of Civil Procedure 52 and for a new trial under Rule 59. WMATA filed a motion to correct "inadvertent omissions" in the original judge's damages calculations. The parties also filed briefs suggesting procedures for resolving the issues left open by the original judge.

Following more than a year of inaction, the parties asked the successor judge to schedule a status conference to discuss the court's plan for proceeding. Instead of holding a status conference, the successor judge issued an order summarily denying all pending motions, explaining that he would not reconsider any issues already decided by the original judge because he was only "attempting to finish the case as [the original judge] would have had he survived long enough." *Mergentime Corp. v. WMATA*, No. 89–1055, at 4 (D.D.C. Apr. 7, 1995) ("April 1995 Order"). The order also established a two-round briefing schedule with respect to the open issues, directing the parties to support their arguments by citing to the existing record. *See id.* at 12–13. Briefing occurred throughout the summer and fall of 1995. Two years later, in July 1997, the successor judge issued his findings and conclusions with respect to the remaining issues, awarding the contractors $4.25 million on their outstanding claims. *Mergentime Corp. v. WMATA*, No. 89–1055 (D.D.C. July 22, 1997) ("July 1997 Order"). He also ordered post-judgment interest to run from the date of his July 1997 final judgment, not from the original judge's July 1993 partial judgment. *Mergentime Corp. v. WMATA*, No. 89–1055 (D.D.C. Sept. 18, 1997) ("September 1997 Order").

On appeal, the contractors claim that the procedure the successor judge adopted for disposing of the post-trial motions and resolving the issues left open by the original judge's death violated Federal Rule of Civil Procedure 63. On the merits, they challenge many of the findings and conclusions of both judges. Cross-appealing, WMATA claims

that postjudgment interest should run from the date of the original judge's July 1993 judgment.

## II

As originally adopted in 1937, Rule 63 provided:

> If by reason of death, sickness, or other disability, a judge before whom an action has been tried is unable to perform the duties to be performed by the court ... after verdict is returned or findings of fact and conclusions of law are filed, then any other judge ... may perform those duties; but if such other judge is satisfied that he cannot perform those other duties because he did not preside at the trial or for any other reason, he may in his discretion grant a new trial.

According to this rule, if a judge became unable to proceed after verdict or judgment, a successor judge could take over and resolve post-trial motions without automatically having to retry the case. The rule made no provision for a judge becoming unable to proceed *during* a trial. Where an original judge became unavailable at any point prior to return of a verdict in a jury trial or the filing of findings of fact and conclusions of law in a bench trial, courts interpreted Rule 63 to require complete retrial. *See Whalen v. Ford Motor Credit Co.*, 684 F.2d 272 (4th Cir.1982) (en banc); *Arrow–Hart, Inc. v. Philip Carey Co.*, 552 F.2d 711 (6th Cir. 1977).

■ Because the growing length of federal trials increased the likelihood that the inability of a judge to continue would interrupt a trial before verdict or judgment, Rule 63 was substantially broadened in 1991 to allow successor judges to take over at *any* point after trial begins, thus creating a more "efficient mechanism" for completing interrupted trials without causing "unnecessary expense and delay." FED. R. CIV. P. 63 advisory committee's note (1991 Amendment). However, recognizing that "injustice ... may result if the substitute judge proceeds despite unfamiliarity with the action," *id.*, amended Rule 63 also imposes additional responsibilities on successor judges. The rule now provides:

> If a trial or hearing has been commenced and the judge is unable to proceed, any other judge may proceed with it upon certifying familiarity with the record and determining that the proceedings in the case may be completed without prejudice to the parties. In a hearing or trial without a jury, the successor judge shall at the request of a party recall any witness whose testimony is material and disputed and who is available to testify again without undue burden. The successor judge may also recall any other witness.

Balancing efficiency and fairness, the new rule thus allows successor judges to avoid retrial, but only to the extent they ensure that they can stand in the shoes of the predecessor by determining that "the case may be completed without prejudice to the parties."

In this case the successor judge served two distinct Rule 63 functions. The first, which flowed from the parties' post-trial motions, called upon him to review the original judge's findings and conclusions. In this sense, the successor judge assumed the role that the original rule contemplated: taking over "after ... findings of fact and conclusions of law are filed." The second role arose from the original judge's inability to make findings and conclusions regarding every issue. This required the successor judge to assume the role specifically contemplated by amended Rule 63: taking over any time after "a trial or hearing has been commenced."

According to the contractors, the successor judge violated Rule 63 in three ways: by failing to consider post-trial motions; by failing expressly to certify his familiarity with the record; and by refusing to recall witnesses. Mindful of the successor judge's two distinct roles in this case, we consider each claim in turn.

### Failure to Consider Post-trial Motions

■ We begin with the contractors' argument that the successor judge violated Rule 63 by failing to reconsider the original judge's findings pursuant to their Rule 52 and Rule 59 motions. According to WMATA, the successor judge did in fact consider the contractors' post-trial motions, but sim-

ply denied them. The record does not support WMATA's assertion.

In his April 1995 Order, the successor judge said specifically that he would "not accept the parties' invitations to second-guess the conclusions [the original judge] reached," and that he would thus "deny all motions that seek to revisit issues clearly decided by" the original judge. April 1995 Order at 2 & n.1. The successor judge cautioned the parties that any "[a]rguments that attempt to second-guess [the original judge's] Opinion or to open up issues that have already been decided *will not be considered.*" *Id.* at 3 (emphasis added). Instead, the successor judge "accept[ed] the factual and credibility determinations that [the original judge] made" and urged the parties "to pursue any claim of error [with respect to the original judge's findings] on appeal." *Id.* at 2, 3 n. 3. In a later order, the successor judge chastised the contractors for attempting to relitigate the original judge's findings, stating again: "To the extent that the parties are dissatisfied with the [original judge's] rulings, an appeal [to the Court of Appeals] is open to them. This Court will not sit as an appellate court with respect to any of [the original judge's] rulings." July 1997 Order at 6 n.2.

Despite these indications that the successor judge gave no consideration to the contractors' post-trial motions, WMATA insists that he actually did consider them, pointing to his statement in the April 1995 Order that he had "examined the extensive record in this case, including [the original judge's] 251 page opinion and all the filings that followed the reassignment." April 1995 Order at 2. According to WMATA, the fact that the successor judge said that he had examined the record and the filings *before* he said that he was denying the contractors' pending motions demonstrates that he fully considered the motions and then denied them on their merits.

We cannot tell what the successor judge meant when he said that he had examined the "record." As WMATA concedes, he could not have meant that he had examined the trial exhibits; the parties had reclaimed them after the original judge died. Indeed,

without the trial exhibits, understanding many of the contractors' arguments would have been impossible. For example, the contractors' Rule 52 motion contended that the original judge erred in finding that they had produced absolutely no evidence to refute WMATA's claimed excess reprocurement costs. According to the contractors, the original judge overlooked the testimony of Dennis Hammond, the reprocurement contractor's project manager, who testified regarding his "cost compilation" document, a trial exhibit that detailed reprocurement costs different from those claimed by WMATA. We reviewed the transcript of Hammond's testimony ourselves and found it totally incomprehensible without simultaneously referring to the cost compilation exhibit. We doubt that the successor judge could have understood Hammond's testimony—and hence the contractors' reprocurement cost arguments—without also referring to the exhibit. Since the successor judge did not have the exhibit when he ruled on the post-trial motions, we think he could not have considered those motions before denying them.

■ By refusing to consider the post-trial motions, the successor judge failed to comply with Rule 63. After all, the original judge could not have refused to consider them. Although district courts enjoy wide discretion to grant or deny post-trial motions, *see Hutchinson v. Stuckey,* 952 F.2d 1418, 1420 (D.C.Cir.1992), they cannot refuse to exercise that discretion. *See* 11 CHARLES A. WRIGHT, ARTHUR R. MILLER & MARY KAY KANE, FEDERAL PRACTICE AND PROCEDURE § 2818, at 194 (2d ed.1995) ("If the trial judge has failed to exercise discretion at all, as when he is under the mistaken apprehension that he has no power to grant the relief sought, the appellate court can review that decision and can order the judge to exercise his discretion."); 12 MOORE'S FEDERAL PRACTICE § 59.54[3] (Matthew Bender 3d ed.1998); *cf. In re Green,* 669 F.2d 779, 786 (D.C.Cir.1981) (district court violated *in forma pauperis* statute by refusing to exercise discretion regarding whether to waive filing fee). Since Rule 63 requires a successor judge to stand in the shoes of the original judge, the successor

judge in this case assumed the original judge's obligation to exercise his discretion with respect to the contractors' post-trial motions. It would be unfair to "deny a litigant's right to try to persuade the court that it has erred simply because the judge who rendered the original decision is unavailable and cannot be called on to reconsider the matter." 12 MOORE'S FEDERAL PRACTICE § 63.05[1].

Quoting from our decision in *Thompson v. Sawyer*, WMATA argues that a successor judge's Rule 63 obligation "does not encompass relitigation of all issues decided by the predecessor judge." 678 F.2d 257, 270 (D.C.Cir.1982). The issue in *Thompson*, however, was whether the successor judge erred in refusing to overturn a decision that the original judge made *years* before he died. The plaintiffs thus had ample opportunity to convince the original judge that he had erred. In this case, the contractors had no such opportunity because the original judge died two days after issuing his order. As *Thompson* put it, a successor judge's "reconsideration of errors may be especially appropriate where the predecessor judge cannot perform the task himself." *Id.*; *see also United States Gypsum Co. v. Schiavo Bros.*, 668 F.2d 172, 176 (3d Cir.1981) (a successor judge is empowered to reconsider legal issues "to the same extent that his or her predecessor could have").

The circumstances of this case made careful consideration of the post-trial motions particularly important for two reasons. First, although the original judge struggled to resolve as much of this complex case as possible before his death, it would be unrealistic to assume that he made no mistakes in his 251–page opinion. Indeed, WMATA itself filed a post-trial motion seeking to correct what it called "inadvertent omissions" in that opinion. And at oral argument, WMATA conceded that the original judge made at least one mistake to the contractors' detriment: He found that by signing the August 1989 agreement the contractors waived their breach of contract claim arising from WMATA's allegedly unreasonable delays in processing their claims. This finding was erroneous because in the August 1989 agree-

ment the contractors waived only their right to terminate performance because of the alleged breach, not their right to sue for breach. The contractors argued this point in their post-trial motion, but the successor judge never considered it.

The second reason for carefully considering the post-trial motions relates to the successor judge's dual role. More than merely assuming the validity of the original judge's findings, the successor judge *relied* on those findings in making additional findings of his own with respect to the issues left unresolved by the original judge. For example, the original judge found that the adverse impact caused by the disapproval of the contractors' plan for controlling traffic on Rhode Island Avenue ceased by November 6, 1986. *See* July 1993 Order at 222. The contractors specifically challenged this finding in their post-trial motion. Without considering their challenge, the successor judge then limited the contractors' damages on their Rhode Island Avenue claim to those incurred before November 6, expressly relying on the original judge's previous finding regarding the Rhode Island Avenue closure. *See* July 1997 Order at 10–11. In other words, the validity of the successor judge's own findings regarding the unresolved issues depends in part on whether the original judge's findings were valid—a question the successor judge was asked to consider, but never did.

### *Failure to Certify Familiarity with the Record*

In January 1995, by which time the successor judge still had not established a schedule for resolving the open issues, the contractors sent him a letter reminding him of Rule 63's requirement that he "certify[ ] familiarity with the record" and suggesting that before he did anything he should retrieve the trial exhibits and certify his familiarity with them. In response, the successor judge issued the April 1995 Order, which identified the outstanding issues and scheduled two rounds of briefing. The order instructed the parties that their briefs should "highlight specific pages in the transcript, specific exhibits, and specific pages in [the original judge's opinion] that support their

particular arguments." April 1995 Order at 3. "This type of detailed support," the successor judge said, would "ensure that [he was] as prepared as possible to rule on the remaining issues without prejudice to either party," *id.*, and would be "adequate to allow [him] to meet the standard established for successor judges" in Rule 63. *Id.* at 3 n.2.

The contractors now argue that the successor judge violated Rule 63 because he never expressly certified his familiarity with the record before resolving the outstanding issues. This argument implicates the two distinct Rule 63 roles the successor judge performed in this case. *See* Perini Br. at 26 (the successor judge's "failure to certify, before either ruling on [the contractors'] motion for reconsideration or adjudicating the open issues, violate[d] Rule 63").

We need not consider whether the successor judge erred in refusing to certify familiarity with the record with respect to his first role (deciding the contractors' post-trial motions); as we have concluded, he failed to consider those motions. *See supra* at 1262–64. We therefore turn to the contractors' argument that the successor judge should have certified his familiarity with the record before ruling on the open issues.

■■■ We begin with a few basics. First, successor judges need only certify their familiarity with those portions of the record that relate to the issues before them. *See Canseco v. United States,* 97 F.3d 1224, 1227 (9th Cir.1996) ("To certify her familiarity with the record, the successor district judge will have to read and consider all relevant portions of the record."); *see also* MOORE'S FEDERAL PRACTICE § 63.04[3]. Second, the extent of the certification obligation depends upon the nature of the successor judge's role in a given case. A successor judge who inherits a jury trial before the close of evidence must become familiar with the *entire* record in order to have the context necessary to rule on evidentiary objections based on relevance. By comparison, a successor judge who inherits a case after the entry of verdict or judgment and who must consider only a narrow post-trial motion—such as one challenging the sufficiency of the evidence regarding a single factual finding—need only

review the portion of the record relevant to that particular issue.

In this case, the contractors do not challenge the procedures by which the successor judge determined which portions of the record were relevant to the open issues, and for good reason: Faced with a record containing 4,000 exhibits and thousands of pages of trial transcript, the successor judge wisely entrusted the parties to guide him through the massive record and point him to the material relevant to their arguments. Far from an abdication of his Rule 63 duties, this procedure made perfect sense.

Rather than claiming that the successor judge gathered the wrong material, the contractors argue that due to the lack of express certification we cannot know whether he reviewed the material he did gather. We think this argument elevates form over substance. Although the successor judge nowhere actually stated that he had reviewed the voluminous appendices of exhibits and transcript excerpts that the parties submitted along with their open issues briefs, we have no doubt that he did. After all, he told the parties that he needed these record excerpts to "satisfy the mandate of Rule 63." April 1995 Order at 3 n.2. The successor judge obviously required this exercise to ensure that the parties directed him to each item in the record relevant to the outstanding issues. We simply do not believe that he then proceeded to ignore these materials in the process of making his findings and conclusions.

To be sure, express certification would have been preferable, for it would have avoided this issue. We find no error here, however, because the procedure the successor judge ordered together with the language he used demonstrate that he complied with Rule 63's basic requirement: that a successor judge become familiar with relevant portions of the record.

### Failure to Recall Witnesses

■■ In their opening district court brief regarding the outstanding issues, the contractors emphasized Rule 63's requirement that "[i]n a hearing or trial without a jury, the successor judge shall at the request of a

party recall any witness whose testimony is material and disputed and who is available to testify again without undue burden." Their brief stated:

> [We] question[ ] whether the issues such as those canvassed [in] the [April] 1995 Order can be determined fairly and reliably by a review of the transcript passages and exhibits cited in the parties' briefs....

> ... [A]ssuredly some open issues will turn on credibility determinations, for example, disputes about relative responsibility for changes and delays, damage computations, and adjustments.... In this brief, [we] rel[y] on testimony and exhibits in evidence. If WMATA challenges their reliability or credibility, [we] request[ ] that appropriate witnesses be recalled.

In their reply brief, filed after WMATA submitted its opening brief identifying the testimony it believed supported its positions on the unresolved issues, the contractors once again argued that the successor judge would have to recall certain of WMATA's witnesses. As an example, they pointed to WMATA's damages expert, who they claimed had "self-destruct[ed] on cross-examination." The contractors offered to submit a complete list of other such witnesses after WMATA submitted its surreply, but the successor judge never afforded the contractors an opportunity to do so before issuing his July 1997 order deciding the remaining issues.

■ The contractors now argue that the successor judge should have recalled WMATA's damages expert as well as other witnesses before resolving the open issues. WMATA, relying on the Ninth Circuit's decision in *Canseco, supra,* responds that recalling witnesses is not always necessary because sometimes successor judges can evaluate witness credibility from the record. *See* 97 F.3d at 1227 ("In the event the sufficiency of the evidence depends upon the credibility of a witness whose credibility is in question, and that credibility cannot be determined from the record, the successor judge will have to recall the witness...."). The successor judge in *Canseco,* however, was only called upon to review her predecessor's findings. Here the successor judge made fresh findings of his own. While Rule 63 allows successor judges to make findings of fact based on evidence heard by a predecessor judge, the 1991 advisory committee note makes clear that this practice is appropriate only "in limited circumstances," such as when a witness has become unavailable or when the particular testimony is undisputed or immaterial. A successor judge, according to the advisory committee note, would "risk error to determine the credibility of a witness not seen or heard who is available to be recalled." Thus, whatever latitude successor judges may have to determine credibility from the record in the context of reviewing an original judge's findings, we hold that in the context of making new findings the plain language of Rule 63 controls: If a party so requests, the successor judge "shall ... recall any witness whose testimony is material and disputed and who is available to testify again without undue burden."

We thus agree with the contractors that the successor judge failed to comply with Rule 63. Nothing in the record indicates that the successor judge determined that WMATA's damages expert was unavailable or that his testimony was immaterial or undisputed—the only permissible reasons for not recalling witnesses when making fresh findings. Moreover, the successor judge never afforded the contractors an opportunity to suggest which additional witnesses they wished to recall.

### III

■ This brings us to the question of relief. Because this case has lingered in this post-trial posture for more than five years, and because the contractors' challenges to the original judge's findings and conclusions are fully briefed, we could address the merits ourselves were the successor judge's failure to consider the parties' post-trial motions the only error in this case. *See Wharf v. Burlington N. R.R. Co.,* 60 F.3d 631, 637 (9th Cir.1995) ("Where the trial court has erroneously failed to exercise its discretion, we may either remand or, if the record is sufficiently developed, decide the issue ourselves.").

But the successor judge's failure to consider recalling witnesses before making his own

findings has left a gap that an appellate court cannot fill. Although we could give the contractors an opportunity (through supplemental briefing) to list the witnesses they wish to recall, we think that Rule 63's witness recall calculus is best performed by the judge ultimately responsible for fashioning findings based on the evidence. Moreover, given the sheer number of witnesses in this case and the stringent recall requirements imposed by Rule 63 when new findings are made, we think it virtually inevitable that remand would be necessary to allow the successor judge to hear new testimony.

Unable to resolve this case once and for all, we vacate the April 1995 and July 1997 Orders and remand for the successor judge to proceed in accordance with Rule 63. To step in the shoes of the original judge as the rule requires, the successor judge first must consider the parties' post-trial motions to the same extent the original judge would have. Once he disposes of those motions, the successor judge should turn to the task of making findings and conclusions regarding the unresolved issues, giving appropriate consideration to whether witnesses must be recalled.

We realize this remand will impose substantial burdens on a district judge who has already expended enormous amounts of time and energy on this case. But the requirements of Rule 63 and the principles of fairness inherent in them require no less.

## IV

We turn finally to WMATA's cross-appeal, in which it challenges the successor judge's determination that postjudgment interest runs from the date of his July 1997 judgment, not from the original judge's July 1993 judgment. Even though we have vacated the July 1997 judgment, we address this issue now because it is fully briefed and because it will almost certainly arise again once the successor judge issues a new order resolving the open issues.

The original judge entered judgment in favor of WMATA for $16.5 million in July 1993. Nearly four years later, in July 1997, the successor judge resolved the open issues

and entered judgment in the contractors' favor for $4.25 million. To perfect their appeal, the contractors posted a bond in the amount of $13.2 million, which they calculated by netting the two judgments and adding interest from the date of the second judgment through January 31, 1999. Objecting to the amount of the bond, WMATA argued that under 28 U.S.C. § 1961 (1994)—providing that post-judgment interest "shall be calculated from the date of the entry of the judgment"—interest should run from the date of the first judgment, not the second.

Relying on this court's opinion in *Hooks v. Washington Sheraton Corp.*, 642 F.2d 614 (D.C.Cir.1980), the successor judge ruled that calculation of post-judgment interest from the date of the second judgment was proper. We agree. *Hooks* held that section 1961 requires post-judgment interest to be calculated from the date the district court enters final judgment under Federal Rule of Civil Procedure 54(b). *See* 642 F.2d at 618. To be sure, *Hooks* involved the difference between a final Rule 54(b) judgment and a clerk-entered judgment under Rule 58(1), while this case involves the difference between a final Rule 54(b) judgment and an interim judgment. Even if this distinction means that *Hooks* does not directly control here, we think that its finality principle best resolves the post-judgment interest question on the facts of this case. The original judge entered partial judgment in 1993 only because he knew he was unable to resolve all issues. Had he lived, he would have had no reason to enter judgment for WMATA until he ruled on *all* of the parties' claims. The original judge's decision to address WMATA's claims before turning to the contractors' claims was simply fortuitous, particularly given that WMATA is a counterclaimant. Under these circumstances, allowing post-judgment interest to run from the date of the original judge's order would be unfair.

WMATA argues that the Supreme Court's post-*Hooks* opinion in *Kaiser Aluminum & Chemical Corp. v. Bonjorno*, 494 U.S. 827, 110 S.Ct. 1570, 108 L.Ed.2d 842 (1990), requires the opposite result. In *Bonjorno*, after a jury returned a verdict in the plaintiff's favor, the district court entered judgment on

August 22, 1979. Citing insufficient evidence, the district court subsequently vacated that judgment. A jury returned a second verdict in the plaintiff's favor on December 2, 1981, and the district court entered judgment on that verdict on December 4, 1981.

The Supreme Court granted certiorari on two questions relevant here: First, under 28 U.S.C. § 1961, is interest calculated from the date of the jury verdict (December 2) or the date that the court subsequently entered judgment on that verdict (December 4)? Second, is interest calculated from the date of a legally insufficient judgment (1979) or from the date of the subsequent correct judgment (1981)? *See id.* at 834, 110 S.Ct. 1570. The Court answered the first question by holding that postjudgment interest runs from the date of the judgment entered upon a verdict, not the date of the verdict itself. *See id.* at 835, 110 S.Ct. 1570. With respect to the second question, the Court held that interest should not be calculated from the date of a judgment later determined to be unsupported by the evidence, stating that post-judgment interest includes "the time between the ascertainment of the damage and the payment by the defendant." *Id.* at 835–36, 110 S.Ct. 1570 (internal quotation omitted). Relying on this language, WMATA argues that interest should run from the date the original judge first entered judgment in its favor because it was on that date that he "ascertained" its damages.

WMATA misreads *Bonjorno.* Not only does the "ascertainment" language have little to do with the invalid judgment passage in which it appears, but WMATA neglects to mention that the Court quoted that language from *Poleto v. Consolidated Rail Corp.*, 826 F.2d 1270 (3d Cir.1987), a case that it expressly rejected in answering the first question by holding that interest runs from the date of the judgment, *not* the date of jury ascertainment. *See Bonjorno*, 494 U.S. at 834, 110 S.Ct. 1570. While we cannot explain *Bonjorno*'s internal inconsistency, we are certain that nothing in it requires interest in this case to run from the date of the original judge's decision. At most, *Bonjorno* holds that "judgment" means judgment, not verdict, and that "judgment" means valid judgment, not invalid judgment. Our holding that on the facts of this case interest runs from the second, final judgment comports with both principles.

*So ordered.*