**John W. DISHMAN, Plaintiff–Appellee–Cross–Appellant,**

v.

**UNUM LIFE INSURANCE COMPANY OF AMERICA; The Adams, Duque & Hazeltine Long Term Disability Income Plan, Defendants–Appellants–Cross–Appellees.**

Nos. 99–55963, 99–56077.

United States Court of Appeals, Ninth Circuit.

Argued and Submitted Feb. 13, 2001

Filed Oct. 17, 2001

Lesley C. Green and Russell G. Petti, Bannan, Green & Frank, Los Angeles, California, for defendants/appellants UNUM Life Insurance Company of America and The Adams, Duque & Hazeltine Long Term Disability Income Plan.

Thomas E. Shardlow and Patricia G. Vick, Law Offices of Shardlow & Vick, Pasadena, California, for appellee/cross-appellant John Dishman.

Henry Solano, Marc I. Machiz, and Marcia Bove, Department of Labor, Washington, DC, for amicus curiae United States.

Before: BEEZER, T.G. NELSON, and BERZON, Circuit Judges.

## ORDER

The Opinion filed May 8, 2001, is withdrawn. A revised Opinion has been filed in its place.

With the amendments made in the revised Opinion, the panel has voted unanimously to deny the petition for rehearing. Judge T.G. Nelson and Judge Berzon deny the petition for rehearing en banc and Judge Beezer so recommends.

The full court has been advised of the suggestion for rehearing en banc and no active judges has requested a vote on whether to rehear the matter en banc. Fed. R.App. P. 35.

The petition for rehearing and the petition for. rehearing en banc are DENIED.

## OPINION

T.G. NELSON, Ciruit Judge:

UNUM Life Insurance Company of America ("UNUM") appeals a bench trial judgment and consequent attorneys' fee award in favor of John Dishman, an ERISA plan participant and benefits claimant. On cross-appeal, Dishman asserts that the district court erroneously dismissed as preempted his state law tort claim. We affirm in part and reverse in part.

## I. FACTS AND PROCEEDINGS BELOW

John Dishman was Executive Director of the Adams, Duque & Hazeltine law firm ("AD & H") from 1986 until July 1993, when he resigned complaining of debilitating migraine headaches. He successfully

applied for long-term disability benefits from UNUM, the insurance company from which AD & H had purchased a long-term disability insurance policy. UNUM began paying Dishman $11,500 monthly in November 1993.

After granting Dishman's claim for disability benefits, UNUM sought and obtained two reports from Dishman's neurologist confirming the severity of Dishman's condition, which had afflicted him since childhood. Moreover, the vocational expert UNUM retained to evaluate Dishman recommended settlement because (1) Dishman's medical record "strongly established" the presence and duration of his condition; (2) Dishman had gone to great lengths to remedy it; (3) Dishman had made "numerous attempts to overcome his disability and improve his work capacity" without avail; and (4) "further medical information was unlikely to render information useful to his claim." Despite this recommendation, in April 1995 UNUM assigned Dishman's claim to its "Complex Claim Unit" because the claim's reserve was $497,154, and it had exhausted risk management tools at the time.

Within the Complex Claim Unit, UNUM assigned Dishman's claim to Frankie Puthoff, who initiated an investigation. Puthoff hired several private investigative agencies to do a "work and sports check" on Dishman, and asked him to submit to two "Independent Medical Evaluations" ("IMEs"), one with a neurologist and another with a forensic psychiatrist.

Neither of those IMEs ever came to pass. One of the "work and sports checks" Puthoff ordered returned ambiguous information suggesting that Dishman might be employed by Semiotix, Inc., a Denver, Colorado, company. The report, which allegedly resulted from an investigator's impersonation of a bank lender, did not indicate the amount Dishman was being paid, or whether any payments were the result of Dishman's ownership of a minority interest in the business. Nonetheless, on the strength of that report and another indicating that Dishman had traveled to Denver three times and was Chairman of the Board of Semiotix, Puthoff telephoned Dishman on July 18, 1995, and informed him that she was terminating his benefits and cancelling the appointments with the neurologist [1] and psychiatrist. Prior to this call, Dishman had no knowledge that UNUM was investigating his claim or giving any thought to stopping benefits payments to him.

Dishman informed Puthoff that he was not employed by Semiotix and that her information was incorrect. Upon learning this, Puthoff told Dishman she was going to "suspend" his benefits rather than deny his claim and that he was to provide her with a statement explaining his relationship with Semiotix, his travel to Colorado, and his investment in any other business, as well as copies of his and Semiotix' 1993 and 1994 tax returns. Notably, the AD & H policy contains no provision for "suspension" of benefits.

UNUM suspended Dishman's benefits without receiving any medical opinion that Dishman was no longer disabled, or that the activities it thought he might be engaged in indicated that he was capable of performing his "own occupation," as his policy required. UNUM made no effort to ascertain whether any money Dishman might have received from Semiotix was sufficient to require a reduction in benefits payment under the terms of the contract. UNUM, moreover, received two additional investigative reports after July 18, 1995, stating that Dishman was not an employee

---

1. The appointment with the neurologist was scheduled for that day.

of Semiotix. Nevertheless, UNUM did not reinstate Dishman's benefits.

After Dishman retained an attorney, a series of correspondence ensued. Highlights of this correspondence include the following facts: (1) Dishman proposed that he be examined by a neutral neurologist, but UNUM declined; (2) UNUM ultimately abandoned its request for Dishman's tax returns and replaced it with a demand for Dishman to arrange for a "forensic certified public accounting firm" to visit Semiotix and "review any documents they deem necessary;" (3) UNUM told Dishman that if he was "unwilling or unable" to cooperate with this unrestricted audit, his file would be "closed"; (4) despite the fact that AD & H's policy contained no mental disability exclusion applicable to Dishman, UNUM insisted that Dishman be evaluated by a "forensic psychiatrist" and proffered several conflicting justifications for this requirement; and (5) Dishman's first request for a copy of UNUM's claim procedure was ignored, and his second request was met with the unequivocal response from UNUM, "UNUM does not have a Claims Procedure with regard to the suspension or termination of benefits."

Upon being told that he had no administrative recourse, Dishman filed the instant suit. In addition to his claims relating to nonpayment of disability benefits, Dishman's complaint alleged that UNUM was vicariously liable for the tortious invasion of privacy perpetrated by the several investigative firms it hired. In February 1996, the district court dismissed this state law claim without a hearing, presumably because it thought the claim was preempted by ERISA. A bench trial on UNUM's "suspension" of benefits ensued, with the result that Dishman prevailed on all his claims.

UNUM appealed the bench trial judgment and fee award, and Dishman cross-appealed the dismissal of his state law cause of action. In a previous memorandum disposition, we held that neither order was an appealable final order because the district court included a line in each to the effect that it might amend or amplify the orders at a later date. On Dishman's motion, the district court issued a "Modified Judgment and Order" on April 20, 1999, that removed that line from the judgment resulting from the trial. On January 29, 2001, pursuant to our suggestion, the court excised the same line from the order dismissing Dishman's invasion of privacy claim. Now that both orders are final, we have jurisdiction to consider the parties' claims on appeal.

## II. ERISA PREEMPTION OF STATE LAW CLAIM

In addition to a host of claims under ERISA, Dishman alleged that under California law UNUM was vicariously liable for the tortious invasion of privacy committed by the investigative firms it hired.[2] Dishman alleged, *inter alia*, that an investigator retained by UNUM elicited information about his employment status by falsely claiming to be a bank loan officer endeavoring to verify information he had supplied; that investigators elicited personal information about him from neighbors and acquaintances by representing that he had volunteered to coach a basketball team; that investigators sought and obtained personal credit card information and travel itineraries by impersonating him; that investigators falsely identified

---

**2.** Throughout the briefing on appeal and below, the parties refer to his claim as Dishman's fourth claim for relief. This appears to be an erroneous transposition of Roman numerals. The original complaint reveals that the state law tort claim was Dishman's sixth claim for relief.

themselves when caught photographing his residence; and that investigators repeatedly called his residence and either hung up or else dunned the person answering for information about him. UNUM did not contest the fact that Dishman stated a claim against it under California law. Rather, it argued that, regardless, Dishman's state law claim was preempted by ERISA. The district court apparently agreed, as it granted UNUM's motion to dismiss this claim.[3]

It is with great trepidation that we tread into the field of ERISA preemption. As we noted in *Rutledge v. Seyfarth, Shaw, Fairweather & Geraldson,*[4] "[d]eveloping a rule to identify whether ERISA preempts a given state law ... has bedeviled the Supreme Court."[5] In 1997, Justice Scalia frankly observed that the fourteen ERISA preemption cases the Supreme Court had taken to that point "ha[d] not succeeded in bringing clarity to the law."[6] Regrettably, neither have the three preemption cases that the Court has taken since.[7] However, because a majority of the Court remains unwilling to embrace the solution advocated by the minority,[8] the amorphous contours of the preemption doctrine present a problem with which we must deal head-on.

The problem is this: 29 U.S.C. § 1144(a) states that ERISA "shall supersede any and all state laws insofar as they ... relate to any employee benefit plan." The question thus becomes, what does "relate to" mean? In 1983, the Court announced that "[a] law 'relates to' an employee benefit plan ... if it has a connection with or reference to such a plan."[9] Twelve years' experience with that standard, however, convinced the Court that it created as many problems as it solved. In *New York Conference of Blue Cross & Blue Shield Plans v. Travelers Insurance Co.,* the Court announced that "[f]or the same reasons that infinite relations cannot be the measure of pre-emption, neither can infinite connections."[10] "Uncritical literalism"[11] is not the answer; rather, "to determine whether a state law has the forbidden connection [to an ERISA plan], we look to 'the objectives of the ERISA stat-

---

3. The order granting UNUM's motion to dismiss provides no reason for the dismissal.

4. 201 F.3d 1212, 1216 (9th Cir.2000), as amended by 208 F.3d 1170 (9th Cir.2000).

5. *Id.*

6. *California Div. of Labor Standards Enforcement v. Dillingham Constr., N.A., Inc.,* 519 U.S. 316, 335, 117 S.Ct. 832, 136 L.Ed.2d 791 (1997) (Scalia, J., with whom Justice Ginsburg joined, concurring).

7. *See, e.g., DeBuono v. NYSA–ILA Med. and Clinical Servs. Fund,* 520 U.S. 806, 117 S.Ct. 1747, 138 L.Ed.2d 21 (1997); *Boggs v. Boggs,* 520 U.S. 833, 117 S.Ct. 1754, 138 L.Ed.2d 45 (1997); *Egelhoff v. Egelhoff,* 532 U.S. 141, 121 S.Ct. 1322, 1330–31, 149 L.Ed.2d 264 (2001) (Scalia, J. with whom Justice Ginsburg joined, concurring) ("I remain unsure (as I think the lower courts and everyone else will be) as to what else triggers the 'relate to'

provision.... I persist in the view that we can bring some coherence to this area....").

8. In *Egelhoff,* Justices Scalia, Ginsburg, Breyer and Stevens indicated a willingness to bring coherence to preemption jurisprudence by clarifying that normal conflict preemption and field preemption principles apply. 121 S.Ct. at 1330–31.

9. *Shaw v. Delta Air Lines, Inc.,* 463 U.S. 85, 96–97, 103 S.Ct. 2890, 77 L.Ed.2d 490 (1983).

10. 514 U.S. 645, 656, 115 S.Ct. 1671, 131 L.Ed.2d 695 (1995); *see also Egelhoff,* 121 S.Ct. at 1327 ("[T]he term 'relate to' cannot be taken to extend to the furthest stretch of its indeterminacy, or else for all practical purposes pre-emption would never run its course.") (internal quotation marks and citation omitted).

11. *Travelers,* 514 U.S. at 656, 115 S.Ct. 1671.

ute as a guide to the scope of the state law that Congress understood would survive,' as well as to the nature of the effect of the state law on ERISA plans." [12]

Congress crafted ERISA's preemption provision

> to ensure that plans and plan sponsors would be subject to a uniform body of benefits law; the goal was to minimize the administrative and financial burden of complying with conflicting directives among States or between States and the Federal Government ... [and to prevent] the potential for conflict in substantive law ... requiring the tailoring of plans and employer conduct to the peculiarities of the law of each jurisdiction.[13]

■ As the Supreme Court explained in *Travelers*, "[t]he basic thrust of the preemption clause ... was to avoid a multiplicity of regulation in order to permit the nationally uniform administration of employee benefit plans." [14] For this reason, the Court explained that it has had no trouble holding that ERISA preempts "state laws that mandate[ ] employee benefit structures or their administration," or that "provid[e] alternative enforcement mechanisms." [15].

In *Travelers*, the Court cited New York's Human Rights Law as a classic example of the former.[16] That comprehensive anti-discrimination law, which the Court found preempted in *Shaw v. Delta Air Lines, Inc.*,[17] required ERISA plan administrators in New York to extend the same benefits to persons disabled by pregnancy as to those disabled by other causes during a period of time when federal law did not so require.[18] As the *Travelers* Court explained, New York's mandates affecting coverage "could have been honored only by varying the subjects of a plan's benefits whenever New York law might have applied, or by requiring every plan to provide all beneficiaries with a benefit demanded by New York law." [19] As further examples of laws preempted under this same rationale, the *Travelers* Court cited the Pennsylvania law at issue in *FMC*

**12.** *Egelhoff,* 121 S.Ct. at 1327 (quoting *Dillingham,* 519 U.S. at 325, 117 S.Ct. 832).

**13.** *Ingersoll–Rand Co. v. McClendon,* 498 U.S. 133, 142, 111 S.Ct. 478, 112 L.Ed.2d 474 (1990).

**14.** *Travelers,* 514 U.S. at 657, 115 S.Ct. 1671.

**15.** *Id.* at 658, 115 S.Ct. 1671. As we noted in *Rutledge,* "[s]ince the Supreme Court decided *Travelers,* we have formulated several different, though compatible, tests in an effort to follow the Supreme Court in fulfilling the statutory mandate of broad preemption without intruding upon state laws beyond the intention of Congress and the objectives of ERISA." *Rutledge,* 201 F.3d at 1217. We decline to apply any of those tests here, however, for two reasons. First, we note that the Supreme Court's recent cases have eschewed such multi-factor tests in favor of a more holistic analysis guided by congressional intent. *See, e.g., Egelhoff,* 532 U.S. 141, 121

S.Ct. 1322, 149 L.Ed.2d 264 (2001). Second, though perhaps useful tools in other contexts, these tests are of marginal utility, where, as here, the question boils down to whether state tort law "relates to" an ERISA plan. Our efforts, like the Supreme Court's, have not succeeded in making this inquiry a precise one.

**16.** *Travelers,* 514 U.S. at 657, 115 S.Ct. 1671.

**17.** 463 U.S. 85, 103 S.Ct. 2890, 77 L.Ed.2d 490 (1983).

**18.** Congress subsequently enacted the Pregnancy Discrimination Act of 1978, 92 Stat. 2076, 42 U.S.C. § 2000e(k) (1976 ed., Supp. V), which eradicated the theretofore lawful practice of discrimination based on pregnancy by making it clear that discrimination based on pregnancy was discrimination based on sex. *Shaw,* 463 U.S. at 89, 103 S.Ct. 2890.

**19.** *Travelers,* 514 U.S. at 657, 115 S.Ct. 1671.

*Corp. v. Holliday*,[20] which required plan providers to calculate benefit levels in Pennsylvania differently than elsewhere, and the New Jersey law at issue in *Alessi v. Raybestos–Manhattan, Inc.*,[21] which, by prohibiting plans from setting workers' compensation payments off against employees' retirement benefits or pensions, effectively precluded them from using a method of calculating benefits permitted by federal law.[22] The fatal flaw in both laws was that they required deviation from the norm; to comply with them, plans necessarily had to vary their administration of benefits state by state.

More recently, the Supreme Court found that a Washington statute that provided for automatic revocation, upon divorce, of any designation of a spouse as a beneficiary of a non-probate asset posed the same problem.[23] The revocation statute, the Court explained, "binds ERISA plan administrators to a particular choice of rules for determining beneficiary status."[24] "Plan administrators cannot make payments simply by identifying the beneficiary specified by the plan documents. Instead they must familiarize themselves with state statutes so that they can determine whether the named beneficiary's status has been 'revoked' by operation of law."[25] Because the statute "governs the payment of benefits, a central matter of plan administration," and thereby "interferes with nationally uniform plan administration,"[26] the Court found the Washington law preempted.

California's common law tort remedy for an "unreasonably intrusive" investigation that amounts to an invasion of privacy[27] bears scant resemblance to the laws the Supreme Court has found violative of this first principle. By no stretch of the imagination can it be said to "mandate employee benefit structures or their administration" as the laws at issue in *Shaw* and *Egelhoff* did. This tort remedy, moreover, is entirely unlike the Pennsylvania law in *Holliday* or the New Jersey law found preempted in *Alessi*. Making ERISA administrators liable for investigations perpetrated by their agents " 'which would be objectionable or offensive to the reasonable man' "[28] simply cannot be said to interfere with nationally uniform plan administration in the manner or to the extent these laws did.

■ *Travelers* also pointed out, however, that state laws may be preempted for another reason: they may provide "alternative enforcement mechanisms" that relate to ERISA plans.[29] By "alternative enforcement mechanisms," the Supreme Court was alluding specifically to cases

---

20. 498 U.S. 52, 111 S.Ct. 403, 112 L.Ed.2d 356 (1990).

21. 451 U.S. 504, 101 S.Ct. 1895, 68 L.Ed.2d 402 (1981).

22. *Travelers*, 514 U.S. at 657–58, 115 S.Ct. 1671.

23. *Egelhoff*, 121 S.Ct. at 1327.

24. *Id.*

25. *Id.* at 1328.

26. *Id.* at 1324.

27. *Comeaux v. Brown & Williamson Tobacco Co.*, 915 F.2d 1264, 1275 (9th Cir.1990) ("California recognizes the tort of 'unreasonably intrusive' investigation as an invasion of privacy."); *Noble v. Sears, Roebuck and Co.*, 33 Cal.App.3d 654, 109 Cal.Rptr. 269, 272 (1973); *Cain v. State Farm Mut. Auto. Ins. Co.*, 62 Cal.App.3d 310, 132 Cal.Rptr. 860, 862 (1976).

28. *Noble*, 109 Cal.Rptr. at 272 (quoting William L. Prosser, *Privacy*, 48 Cal. L.Rev. 383, 390–91 (1960)).

29. *Travelers*, 514 U.S. at 658, 115 S.Ct. 1671.

like *Ingersoll–Rand Co. v. McClendon*,[30] in which a former employee brought a wrongful discharge cause of action alleging that his employer discharged him to avoid vesting of ERISA benefits.[31] It is clear, however, that ERISA "supplant[s] a variety of state law causes of action for the wrongful denial of benefits."[32] As the Supreme Court held in *Pilot Life Insurance Co. v. Dedeaux*,[33] these include claims for tortious breach of contract, breach of fiduciary duty, and fraud in the inducement.[34] Claimants simply cannot obtain relief by dressing up an ERISA benefits claim in the garb of a state law tort.

Consistent with *Pilot Life*'s teaching, in *Bast v. Prudential Insurance Co. of America*,[35] we held that the husband and son of a woman who allegedly died from cancer as a result of an ERISA plan administrator's failure to timely authorize lifesaving treatment could not maintain state law causes of action for, *inter alia*, breach of contract, loss of consortium, and emotional distress because these claims were preempted by ERISA. In so doing, we characterized these torts as causes of action "asserting improper processing of a claim for benefits under an insured employee benefit plan."[36] But for the denial of the Basts' claim, there would have been no grounds for their state law actions. If Prudential had authorized the requested treatment, there would have been no loss of consortium, no breach of contract, and presumably no emotional distress. The Basts, every bit as much as the discharged plaintiff in *Ingersoll–Rand*, were seeking an "alternative enforcement mechanism."

UNUM oversimplifies this case by likening it to *Bast* and *Pilot Life*. The Basts' intentional infliction of emotional distress claim was preempted because the emotional distress they allegedly suffered arose from Prudential's failure to timely pay them benefits. The harm they suffered was inextricably intertwined with the plan's decision not to pay. Thus, to find Prudential liable for intentional infliction of emotional distress for not paying benefits would be tantamount to compelling benefits, which assuredly "encroaches on the relationships regulated by ERISA."[37]

Unlike the Basts, Dishman is not seeking to obtain through a tort remedy that which he could not obtain through ERISA. As he notes, his damages for invasion of privacy remain whether or not UNUM ultimately pays his claim. His tort claim does not depend on or derive from his claim for benefits in any meaningful way.

■ UNUM argues that Dishman's claim must "relate to" the plan, because but for the plan's relationship of insurer and insured, UNUM would have had no need to investigate Dishman's claim of disability.[38] Dishman, UNUM contends, "cannot reasonably dispute that UNUM

---

**30.** 498 U.S. 133, 111 S.Ct. 478, 112 L.Ed.2d 474 (1990).

**31.** *Travelers*, 514 U.S. at 658, 115 S.Ct. 1671.

**32.** James F. Jordan, et al., *Handbook on ERISA Litigation* § 2.06[A] (2000 Supplement).

**33.** 481 U.S. 41, 107 S.Ct. 1549, 95 L.Ed.2d 39 (1987).

**34.** *Id.* at 47–48, 107 S.Ct. 1549.

**35.** 150 F.3d 1003 (9th Cir.1998).

**36.** *Id.* at 1007.

**37.** *Geweke Ford v. St. Joseph's Omni Preferred Care Inc.*, 130 F.3d 1355, 1358 (9th Cir.1997) (quotations omitted).

**38.** We assume, for the sake of argument, that the information UNUM endeavored to collect in fact had some relevance to Dishman's eligibility for disability benefits, though whether and to what extent that is true is debatable.

performed these alleged actions in the course of its administration of the plan under which [he] was seeking benefits." This argument smacks of the "uncritical literalism" the Supreme Court has admonished us to eschew. Obviously, at some level Dishman's tort claim relates to the plan. That cannot be denied. But that cannot be the end of the analysis, either, for as we know, "[p]re-emption does not occur ... if the state law has only a tenuous, remote, or peripheral connection with covered plans, as is the case with many laws of general applicability."[39]

■ The fact that the conduct at issue allegedly occurred "in the course of UNUM's administration of the plan" does not create a relationship sufficient to warrant preemption. If that were the case, a plan administrator could "investigate" a claim in all manner of tortious ways with impunity. What if one of UNUM's investigators had accidentally rear-ended Dishman's car while surveiling him? Would the fact that the surveillance was intended to shed light on his claim shield UNUM and the investigator from liability? What if UNUM had tapped Dishman's phone, put a tracer on his car, or trained a video camera into his bedroom in an effort to obtain information? Must that be tolerated simply because it is done purportedly in furtherance of plan administration? To ask the question is to answer it. Though there is clearly some relationship between the conduct alleged and the administration of the plan, it is not enough of a relationship to warrant preemption. We are certain that the objective of Congress in crafting Section 1144(a) was not to provide ERISA administrators with blanket immunity from garden variety torts which only peripherally impact daily plan administration. Accordingly, the district court's dismissal is reversed, and the state law claim is remanded for further proceedings.

## III. EXHAUSTION OF ADMINISTRATIVE REMEDIES

■ Federal courts have authority to enforce the exhaustion requirement in ERISA actions, "and [ ] as a matter of sound policy they should usually do so."[40] That said, we have made it clear that there are exceptions to the general rule,[41] and that when a district court determines that one of these exceptions applies, we review that determination for an abuse of discretion.[42] We find no abuse of discretion here.

■ The district court excused Dishman's failure to exhaust his administrative remedies because it found that UNUM gave him inadequate notice of both the denial of his claim and the available appeals procedure. The district court's findings of fact amply support this determination. For example, the court found that on July 18, 1995, Puthoff called Dishman and told him she was denying his claim. She later retreated somewhat and said she was merely "suspending" his benefits until he provided certain tax and employment information. Because neither AD &

---

39. *Travelers,* 514 U.S. at 661, 115 S.Ct. 1671 (internal quotation marks and alteration omitted).

40. *Amato v. Bernard,* 618 F.2d 559, 568 (9th Cir.1980).

41. *See id.* ("[D]espite the usual applicability of the exhaustion requirement, there are occasions when a court is obliged to exercise its jurisdiction and is guilty of an abuse of discretion if it does not, the most familiar examples perhaps being when resort to the administrative route is futile or the remedy inadequate." (citation omitted)).

42. *Diaz v. United Agric. Employee Welfare Benefit Plan and Trust,* 50 F.3d 1478, 1483 (9th Cir.1995).

H's policy nor ERISA's claim procedures contemplate "suspension" of payments, as opposed to termination, Dishman subsequently requested a copy of the procedures UNUM invoked. UNUM ignored this first request for information, prompting Dishman to repeat it. In response to the inquiry, "Does UNUM have any procedures applicable to the suspension and threatened termination of Mr. Dishman's benefits? If so, is UNUM willing to provide me with a copy?" UNUM's unequivocal response was, "UNUM does not have a Claims Procedure with regard to the suspension and termination of benefits." The district court found, moreover, that UNUM did not provide Dishman or his counsel with a copy of the claims procedure. We find nothing in the record to suggest that these facts are clearly erroneous.

The district court's decision to excuse Dishman's failure to exhaust his administrative remedies is further supported by the fact that the district court offered, earnestly and in good faith, to allow UNUM thirty days to undertake its administrative process, and UNUM rejected that offer. When the court first offered to give UNUM thirty days, UNUM's counsel replied that she was not the one who makes that decision. When the court repeated and clarified its offer, UNUM's counsel denigrated the proposition, thinking aloud about the repercussions on the administrative record and any subsequent standard of review. Under these circumstances, it was not an abuse of discretion for the court to excuse Dishman's failure

to exhaust his administrative remedies. The court properly upheld Dishman's decision to proceed directly to suit.

## IV. SCOPE OF THE DISTRICT COURT'S REVIEW

Although there was no administrative review, UNUM contends that the district court should have limited its de novo review of UNUM's decision to deny Dishman benefits to the contents of the administrative record. This argument lacks merit.

 It is true that in *Kearney v. Standard Insurance Co.*[43] we held that "[when] a court reviews [an ERISA] administrator's decision, whether de novo ... or for abuse of discretion, the record that was before the administrator furnishes the primary basis for review."[44] However, in *Mongeluzo v. Baxter Travenol Long Term Disability Benefit Plan,*[45] we recognized that the administrative record need not serve as the exclusive basis for review. A district court may, in its discretion, allow evidence that was not before the plan administrator "when circumstances clearly establish that additional evidence is necessary to conduct an adequate *de novo* review of the benefit decision."[46] When a district court deems those circumstances met, we review its decision for an abuse of discretion.[47]

We find no abuse of discretion here, either. No administrative review preceded UNUM's decision to "suspend" Dishman's benefits. Thus, Dishman, unlike the plaintiff in *Kearney,* could not have "easily

**43.** 175 F.3d 1084, 1090 (9th Cir.1999) (en banc).

**44.** *Id.*

**45.** 46 F.3d 938 (9th Cir.1995).

**46.** *Mongeluzo,* 46 F.3d at 944 (quotation marks and citation omitted); *accord Kearney,*

175 F.3d at 1090. The *Mongeluzo* court juxtaposed "necessity" to situations in which "someone at a later time comes up with new evidence that was not presented to the plan administrator." 46 F.3d at 944.

**47.** *Kearney,* 175 F.3d at 1091.

... submitted [the belatedly-proffered] material to [his plan administrator]" before the initial termination decision was made.[48] Dishman could have submitted the materials clarifying his relationship with Semiotix after UNUM suspended his benefits, but in light of the fact that UNUM told him no appeals process applied to him, one can hardly fault him for not doing so. In this case, there was no administrative process to speak of, and hence there is no administrative record. Thus, the need to introduce evidence from outside the record to facilitate de novo review is stronger here than in *Mongeluzo,* where the administrative record found wanting was present but flawed.[49]

UNUM's argument to the contrary is not persuasive. It concedes that where necessary, a district court may look outside the record to evaluate a plan administrator's decision, but relies on a version of the facts the district court clearly rejected to argue that such recourse was unnecessary here. UNUM continues to press the idea that Dishman was in the wrong. That is not the conclusion the district court came to, and because there is no showing that the court's factual conclusions are clearly erroneous, there is no basis for disregarding them and crediting UNUM's alternative version of events. If UNUM did not want Dishman to be able to impress the judge with his personal, credible testimony, or for Semiotix's president to be able to testify to the nature of Dishman's relationship to that company, then UNUM should have followed the proper procedures and allowed Dishman to present that information to it in the first instance (before terminating his benefits, or, at the least, in a subsequent administrative appeal). The district court did not err.

## V. SUFFICIENCY AND TIMELINESS OF DISHMAN'S "PROOF OF CLAIM"

UNUM argues that it had the right to suspend Dishman's benefits because Dishman "refused to provide the information reasonably requested by UNUM." This argument is foreclosed by the district court's decision.

UNUM's contention that due to "(1) [its] right to continue to evaluate Dishman's claim, (2) [its] reasonable request for clarifying information, and (3) Dishman's flat refusal to provide any of the requested information," it was "well within its rights as Plan administrator to suspend and/or deny further benefits," inverts the sequence of events. Puthoff did not "suspend" Dishman's benefits after Dishman refused to provide information. Rather, she terminated his benefits *first* and then indicated a willingness to consider any clarifications. Dishman cooperated up to July 18, 1995, the day Puthoff called to deliver the bad news; indeed, it was she, not he, who cancelled the IME that UNUM had scheduled and which Dishman had agreed to attend, on that day. The picture UNUM strives to paint of an intransigent claimant who stonewalled it for information until it had no choice but to discontinue benefits in order to prompt information flow could not be more contrary to the facts the district court found.

These facts preclude UNUM from prevailing on this eleventh hour theory. Assuming, for the sake of argument only, that the "proof of loss" language contained in the AD & H policy requires Dishman to proffer, monthly and without any request therefor, proof of his continued disability and sources of income, and he failed to do so, reversal of the district court's decision

---

48. *Id.*

49. 46 F.3d at 944.

would not be warranted. The trial judge found that UNUM was not motivated by a legitimate purpose in "suspending" Dishman's benefits and demanding information from Dishman. Indeed, the court opined that the "suspension" may well have been intended to place pressure on Dishman to settle his claim on favorable terms to UNUM. In light of these findings, the fact that UNUM may be able, post-hoc, to offer a legally plausible justification for its termination of Dishman's benefits is irrelevant.

## VI. ATTORNEYS' FEE AWARD

UNUM contends that the district court's award of attorneys' fees is flawed in two ways: (1) it compensates counsel for a tangential, frivolous state law claim; and (2) it compensates counsel for "pre-litigation" expenses.

■ As explained above, we do not agree that Dishman's invasion of privacy claim is frivolous. On the contrary, we hold that the district court's dismissal was erroneous because the claim is not preempted. Because we reverse the dismissal, however, we must also remand the attorneys' fee award so that fees related to this claim can be excised, as it is currently premature to consider eligibility for fees for this claim.

■ UNUM next argues that by awarding Dishman attorneys' fees for work done prior to the filing of his complaint, the district court exceeded its authority and contravened our decision in *Cann v. Carpenters' Pension Trust Fund for Northern California.*[50] Contrary to UNUM's assertion, *Cann* does not stand for the proposition that ERISA plaintiffs may not recover attorneys' fees for any work done prior to the date they file their complaint.[51] Rather, *Cann* simply holds that ERISA's attorneys' fee provision, 29 U.S.C. § 1132(g)(1), was not meant to reimburse claimants for legal expenses "incurred during administrative proceedings prior to suit,"[52] even though such proceedings are "necessary and valuable."[53] Put simply, ERISA does not "allow[ ] for attorneys' fees for the administrative phase of the claims process."[54]

■ The *Cann* court put this principle into practice by upholding the district court's award of attorneys' fees which "pare[d] off the administrative work from the work on the lawsuit"[55] and compensated the claimant's attorney for the latter work only.[56] The district court here understood *Cann*'s practice perfectly. The court did not mistakenly compensate Dishman's counsel for work done in furtherance of an administrative action; it deliberately included all the work done in the fee award because there was nothing to pare off. It found that none of the claimed hours were expended in connection with the exhaustion of administrative proce-

---

**50.** 989 F.2d 313 (9th Cir.1993).

**51.** *See Williams v. Unum Life Ins. Co. of Am.,* 1996 WL 162972, at *3 n. 1 (N.D.Cal.1996): Defendants also argue that the attorneys' fees requested by [the plaintiff] are excessive because attorneys' fees for pre-litigation work are not recoverable. *Cann* held that ERISA's attorneys' fees provision does not allow fees for the administrative phase of the claims process. However, attorneys' fees for work done on the lawsuit prior to the filing of the lawsuit are recoverable.

**52.** *Cann,* 989 F.2d at 315.

**53.** *Id.* at 316.

**54.** *Id.* at 314.

**55.** *Id.* at 315.

**56.** *Id.* This work was done up to fifty-one days before the complaint was filed. *Id.*

dures, inasmuch as UNUM did not make any administrative remedy available to the plaintiff. In addition, the court made a factual finding that "the hours claimed for work performed before the filing of the complaint were for conferences with clients, drafting the complaint and other reasonable efforts directed toward the filing of the litigation." These are exactly the kind of expenses *Cann* sanctioned.[57] They do not have to be excised. Because other costs do, however, we reverse and remand the award of attorneys' fees.[58]

## VII. PREJUDGMENT INTEREST

The district court's award of prejudgment interest must also be reversed. The court awarded Dishman prejudgment interest at the rate of 16%, a rate Dishman had requested based on a trial exhibit tending to show that UNUM anticipated this rate of return on the reserve it maintained for his claim. The district court, however, did not justify its selection of the prejudgment interest rate based on what it thought UNUM earned. Rather, the court made it clear that it wanted UNUM to pay *more* than it could have earned to make amends for its bad faith conduct:

> The court finds that the equities of this case, namely the defendants' bad faith termination of the plaintiff's benefits, require this higher interest rate to disgorge the defendants of more than the amount of return that they obtained by retaining the money that the plaintiff was due. The court accepts the plaintiff's proposed rate of 16%. However, the court will vacate this paragraph of the judgment and set the rate at twice the actual rate of the return of the de-

fendants' investment portfolio if, by May 22, 1997, the defendants show with sufficient evidence that the actual rate of the return on their investment portfolio was less than 8%.

Awarding 16% prejudgment interest on this rationale was an abuse of discretion. Prejudgment interest is an element of compensation, not a penalty.[59] Although a defendant's bad faith conduct may influence whether a court awards prejudgment interest, it should not influence the rate of the interest. Thus, we remand this case to allow the district court to choose a prejudgment interest rate that compensates Dishman for the losses he incurred as a result of UNUM's nonpayment of benefits, rather than a rate that doubles UNUM's portfolio return in order to punish it. It is entirely possible, of course, that such a rate may meet or exceed the 16% the district court assigned initially.

## VIII. THE OPERATIVE JUDGMENT

UNUM contends that, even though this court held that the district court's April 1997 judgment was not a final appealable order, postjudgment interest on the underlying judgment should accrue from that date. Dishman takes the opposite position, asserting that postjudgment interest should accrue from April 20, 1999, when the court entered its "Modified Judgment and Order," and that the higher rate of prejudgment interest should apply prior to that date. Although we reverse and remand the district court's award of prejudgment interest, we must still decide when its applicability ceases and postjudgment interest begins to accrue, be-

**57.** *Id.*

**58.** We direct the district court to award Dishman interest on his attorneys' fee award beginning January 29, 2001, the date the district

court entered the Order which made final the orders appealed from. *See* Part VII, *infra.*

**59.** *Western Pac. Fisheries, Inc. v. SS President Grant,* 730 F.2d 1280, 1288 (9th Cir.1984).

cause the same issue will assuredly arise after the district court reestablishes an appropriate rate. Unfortunately, the law provides no clear guidance on this point.

Title 28 U.S.C. § 1961(a) provides that postjudgment interest "shall be calculated from the date of the entry of the judgment." The statute itself does not specify whether the judgment must be a final, appealable one. Dishman argues, however, that Federal Rule of Civil Procedure 54 compels that conclusion. We disagree.

Rule 54, which is entitled "Judgments; Costs," provides that " 'Judgment' as used in these rules includes a decree and any order from which an appeal lies." Fed. R.Civ.P. 54(a). This language is ambiguous; it is simply not clear whether a "decree" and an "order from which an appeal lies" are the only two things that comprise a judgment, or whether these things are but two examples of a larger class.[60] We note that, generally, to say A includes B does not exclude the possibility that A also includes C and D. More concretely, Rule 54's statement that a judgment "includes . . . any order from which an appeal lies" "does not require the conclusion that any order that is not a final, appealable judgment is not a 'judgment.' "[61] We agree with the Sixth Circuit that "Rule 54 . . . does not definitively answer the question of whether post-judgment interest begins to accrue when the district court enters a partial [or non-final] judgment."[62]

Having found no answer in the rule's plain language, we turn our attention to precedent. Again, however, we find scant guidance. Although the Supreme Court dealt with the topic of postjudgment interest in *Kaiser Aluminum & Chemical Corp. v. Bonjorno*,[63] that case is plainly distinguishable on the facts. In *Kaiser*, the district court concluded that two successive jury verdicts awarding damages to the plaintiffs were unsupported by the evidence. After the first jury verdict, the district court vacated the judgment entered on that new verdict and granted the defendant's motion for a new trial. However, the second jury awarded the plaintiffs a higher damage award than the first jury. Upon defendant's motion, the court granted judgment notwithstanding the verdict as to part of the damages awarded, vacated the judgment entered on the second jury verdict, and entered a third judgment on a reduced damages amount. The Third Circuit vacated the third judgment entered by the district court and reinstated the judgment entered by the second jury's damage award. The Supreme Court granted certiorari to consider the calculation of postjudgment interest and held that, under § 1961, postjudgment interest should run from the date of the second vacated judgment. The Court reasoned that "[t]he purpose of postjudgment interest is to compensate the successful plaintiff for being deprived of compensation for the loss from the time between the ascertainment of the damage and the payment by the defendant."[64] It rejected the

---

**60.** *See* Webster's Third New International Dictionary 1143 (1986) (defining the word "include" as "1: to shut up: confine, enclose, bound [the nutshell s the kernel] . . . 2a: to place, list, or rate as a part or component of a whole or of a larger group, class or aggregate," but also noting that the word "may call more attention to the single item or smaller class by stressing the fact of its existence or the fact of its not having been overlooked").

**61.** *Skalka v. Fernald Envtl. Restoration Mgmt. Corp.*, 178 F.3d 414, 428 (6th Cir.1999).

**62.** *Id.*

**63.** 494 U.S. 827, 110 S.Ct. 1570, 108 L.Ed.2d 842 (1990).

**64.** *Id.* at 835–36, 110 S.Ct. 1570 (citation omitted).

contention that interest should run from the date of the first judgment because "[w]here the judgment on damages was not supported by the evidence, the damages have not been 'ascertained' in any meaningful way." [65]

*Kaiser* assisted us in deciding cases like *Tinsley v. Sea–Land Corp.,*[66] where the question presented was "whether the damages were sufficiently ascertained as of the date of the original judgment where on appeal this court ordered the district court to reduce the damage award in proportion to the plaintiff's comparative negligence." [67] There we had little difficulty deciding that damages were meaningfully ascertained the first time around and, thus, that postjudgment interest would run from the date of the initial judgment.[68] The difference between that case and this case, however, is that *Tinsley* involved two final, appealable judgments, whereas this case only involves one. *Kaiser* simply does not address whether this distinction is meaningful.

The District of Columbia Circuit has held that it is, and although the facts and equities of this case are quite different, we agree. *Mergentime Corp. v. Washington Metropolitan Area Transit Authority*[69] was a sad and unique case. After presiding over a 45–day bench trial in a multimillion dollar case, the district judge developed a terminal illness. As the illness worsened, the judge continued to work heroically, issuing a 251–page opinion containing partial findings of fact and conclusions of law just two days before he died. The case was reassigned to a successor judge, who four years later issued his own findings of fact and conclusions with respect to remaining issues. The successor judge ordered postjudgment interest to run from the date of his final judgment, not from the original judge's partial judgment.[70] On cross-appeal, the Washington Metropolitan Area Transit Authority (WMATA) claimed that postjudgment interest should run from the date of the original judge's partial order.

The D.C. Circuit disagreed. It held that finality principles dictated that interest should run from the second, final judgment. Admittedly, equitable principles drove its analysis. The court reasoned that it would be unfair to allow WMATA to collect prejudgment interest dating back to the first partial judgment, because its existence was simply fortuitous: had the district judge not been diagnosed with terminal cancer, he would have had no reason to enter judgment until he ruled on all of the parties' claims.[71] The same cannot be said here because the April 1997 judgment was not a fortuitous event. On the contrary, it was meant to conclusively embody Dishman's triumph and put an end to the litigation. Neither party lucked into the judgment; rather, it came in due course and had all the hallmarks of a final judgment except for the inclusion of one improper line.

■ By holding that postjudgment interest runs only from a final, appealable judgment, we make Dishman the beneficiary of the district court's misstep. This is a fortuitous event, for unlike *WMATA*, no fairness considerations compel this re-

---

65. *Id.*

66. 979 F.2d 1382 (9th Cir.1992).

67. *Id.* at 1383.

68. *Id.*

69. 166 F.3d 1257 (D.C.Cir.1999).

70. *Id.* at 1261.

71. *Id.* at 1267.

sult.[72] However, practical considerations do. A final, appealable judgment is a clear dividing line: either one exists, or one does not.[73] This clarity will create salutary incentives. If plaintiffs want postjudgment interest to start, or defendants want prejudgment interest to stop, they will likely take action to ensure that the judgment is final. A clear rule invites vigilance, while an unclear rule like that which the Sixth Circuit has adopted[74] invites confusion and further litigation. Thus, we hold that "judgment" within the meaning of 28 U.S.C. § 1961 means "final, appealable order" and therefore, postjudgment interest in this case runs from January 29, 2001.

AFFIRMED IN PART, REVERSED IN PART AND REMANDED. Costs awarded to Appellee/Cross–Appellant Dishman. Pursuant to the parties' motion and Ninth Circuit Rule 39–1, we transfer consideration of attorneys' fees on appeal to the district court from which this action was taken.

---

**72.** We note, however, that although the district court's prejudgment interest rate was much higher than the postjudgment interest rate, it was Dishman, not UNUM, who finally moved the district court to remove from its judgment the line that prevented it from becoming final and appealable.

**73.** We express no view as to whether, if a situation akin to this were to arise again, a district court could avoid any unfairness by issuing the second judgment *nunc pro tunc* to the date of the original, but defective, judgment.

**74.** *See Skalka,* 178 F.3d at 429 ("We believe that the better rule is for plaintiffs to be entitled to post-judgment interest from the date of entry of the initial, partial judgment ... even though that judgment was not yet appealable.").