# Illinois Official Reports

## Appellate Court

---

**Watkins v. M Class Mining Health Protection Plan**, 2020 IL App (5th) 180138

---

| | |
|---|---|
| Appellate Court Caption | JEFFERY WATKINS and KATELYNN WATKINS, Plaintiffs-Appellees, v. M CLASS MINING HEALTH PROTECTION PLAN, an Employee Welfare Benefit Plan, Defendant-Appellant. |
| District & No. | Fifth District<br>Nos. 5-18-0138, 5-18-0377 cons. |
| Filed | May 7, 2020 |
| Decision Under Review | Appeal from the Circuit Court of Madison County, No. 16-L-1393; the Hon. Dennis R. Ruth, Judge, presiding. |
| Judgment | Affirmed in part and reversed in part; cause remanded with directions. |
| Counsel on Appeal | Edna S. Kersting, of Wilson, Elser, Moskowitz, Edelman & Dicker, LLP, of Chicago, for appellant.<br><br>David L. Antognoli, of Goldenberg, Heller & Antognoli, P.C., of Edwardsville, for appellees. |

Panel    JUSTICE CATES delivered the judgment of the court, with opinion. Presiding Justice Welch and Justice Wharton[*] concurred in the judgment and opinion.

## OPINION

¶ 1     The plaintiffs, Jeffery Watkins (Jeffery) and his daughter Katelynn Watkins (Katelynn), brought this action pursuant to the Employee Retirement Income Security Act of 1974 (ERISA) (29 U.S.C. § 1001 *et seq.* (2012)) challenging the decision of the M Class Mining Health Protection Plan (Plan) to deny coverage for medical expenses Katelynn incurred as a result of a motor vehicle accident. On the parties' cross-motions for summary judgment, the circuit court of Madison County granted judgment in favor of the plaintiffs, finding the claims for the injuries related to the accident were not excluded under the Plan and entered a judgment against the Plan in the amount of $1,202,714.12. For the reasons that follow, we reverse the circuit court's award of $107,214 in attorney fees and remand for reconsideration of the attorney fees award and affirm the circuit court's judgment in all other respects.

¶ 2                                    BACKGROUND

¶ 3     On February 19, 2016, Katelynn, who was 16 years old, was seriously injured in a single-car automobile accident while she was driving to school. At the time of the accident, Jeffery worked for M Class Mining (Employer) and received healthcare coverage through the Plan, Employer's welfare benefit plan. Katelynn was also a beneficiary and a participant of the Plan.

¶ 4     There was no dispute that the Plan was a self-funded employee welfare benefit plan as defined by ERISA. The Plan was administered in accordance with a Plan document. The Plan document identified the Employer as the Plan administrator and the Plan's only named fiduciary. The Plan document stated that the Plan administrator had retained the services of MCA Administrators, Inc. (MCA), to act as a third-party administrator, which would "provide certain claims processing and other technical services."

¶ 5     Article 8.01 of the Plan document states, in relevant part:

> "The Plan Administer shall administer this Plan in accordance with its terms and establish its policies, interpretations, practices, and procedures. It is the express intent of this Plan that the Plan Administrator shall have maximum legal discretionary authority to construe and interpret the terms and provisions of the Plan, to make determinations regarding issues which relate to eligibility for benefits ***, to decide disputes which may arise relative to a Participant's rights, and to decide questions of Plan interpretation and those of fact relating to the Plan. The decisions of the Plan Administrator as to the facts related to any claim *** shall receive the maximum deference provided by law and will be final and binding on all interested parties. Benefits under this Plan will be paid only if the Plan Administrator decides, in its discretion, that the Participate is entitled to them."

<hr />

[*]Justice Chapman was originally assigned to participate in this case. Justice Wharton was substituted on the panel subsequent to Justice Chapman's retirement and has read the briefs and listened to the recording of oral argument.

¶ 6    Article 8.02 of the Plan document provided that the administrator's duties included determining all questions of eligibility, status, and coverage under the Plan; interpreting the Plan, including construing disputed terms; making factual findings; deciding disputes relative to a participant's rights; reviewing claim denials and appeals of denial; appointing and supervising a third-party administrator to pay claims; and delegating such powers, duties, and responsibilities as appropriate.

¶ 7    Article 9.01, titled "Health Claims," states:

"All claims and questions regarding health claims should be directed to the Third Party Administrator. The Plan Administrator shall be ultimately and finally responsible for adjudicating such claims and for providing full and fair review of the decision on such claims in accordance with the following provisions and with ERISA. Benefits under the Plan will be paid only if the Plan Administrator decides in its discretion that the Participant is entitled to them. The responsibility to process claims in accordance with the Plan Document may be delegated to the Third Party Administrator; provided, however, that the Third Party Administrator is not a fiduciary of the Plan and does not have the authority to make decisions involving the use of discretion."

¶ 8    In the event of an adverse benefit determination, the Plan document gives the participant the right to receive (1) notice of the specific reasons for the denial; (2) a description of any additional information necessary for the participant to perfect the claim and an explanation of why such information is necessary; (3) copies of all documents, records, and other information relevant to the participant's claim for benefits; and (4) any rule, guideline, protocol, or similar criterion that was relied upon in making the determination.

¶ 9    Article 9.02A of the Plan document entitled a participant to a full and fair review of an adverse benefit determination. This included "a review that does not afford deference to the previous adverse benefit determination and that is conducted by an appropriate named fiduciary of the Plan, who shall be neither the individual who made the adverse benefit determination that is subject of the appeal, nor the subordinate of such individual."

¶ 10    Following the accident, Katelynn received medical treatment from numerous providers. The plaintiffs and the medical providers made timely claims to the Plan for reimbursement of their medical expenses incurred for treating Katelynn by submitting their claims to MCA.

¶ 11    The administrative record included several e-mail chains between MCA employees.[1] On March 16, 2016, Sharla Hassings, a registered nurse and care manager affiliated with MCA, reported to MCA employee Deborah Immel that Jeffery had informed Hassings that Jeffery did not have automobile insurance at the time of Katelynn's accident. Immel then relayed this information to several MCA employees, including Cathy Dickson, Carol Jeffries, Tina Ezersky, and Maryann Marasco, asking, generally, whether Katelynn's medical expenses would be covered by the Plan. In an undated e-mail, Ezersky, an MCA "Claims Auditor," then forwarded the previously described e-mail chain to Jeffries, stating Katelynn's claims would be denied based on the Plan's illegal act exclusion and directed Jeffries to issue a letter denying

---

[1]MCA's records, as contained in the administrative record, frequently refer to their employees by only their first names or by their initials. For clarity of this opinion, we have made our best effort to accurately discern the identity of each individual based on context, and to eliminate all unnecessary monikers. The actual identity of these individuals, however, does not dictate the outcome in this case, as they were all MCA employees, or persons affiliated with MCA.

Katelynn's medical treatment claims. The illegal act exclusion provides that the Plan would not cover any charge for care, supplies, or services "[t]hat are to treat Injuries sustained or a Sickness contracted while the Participant committed or attempted to commit a felony or misdemeanor, or was engaged in an illegal occupation or activity."

¶ 12    Following this determination, MCA sent letters to several providers denying payment on the claims related to Katelynn's injuries. MCA stated the claims were barred by the illegal act exclusion because "there was no automobile insurance coverage in effect at the time of the accident." These letters were signed by Jeffries, a "Claims Supervisor" for MCA. The denial letters indicated that Jeffery and Employer were also sent copies of the letters.

¶ 13    The record includes another e-mail chain dated March 18, 2016, wherein Marasco asked Jeffries, on behalf of Dickson, if MCA could deny another provider claim related to Katelynn's accident. On that same date, Ezersky made a notation in MCA records that pursuant to a discussion with Dickson, the claim would be denied under the illegal act exclusion. Jeffries then made a notation in MCA records that she sent a denial letter to the provider.

¶ 14    On August 24, 2016, counsel for the plaintiffs sent MCA an appeal of the initial denial of the claims for medical benefits. The plaintiffs asserted that the claims were erroneously denied because (1) Katelynn and the motor vehicle she was operating at the time of the accident were covered by a liability insurance policy in compliance with Illinois law and (2) even if the vehicle was uninsured, Katelynn was not engaged in an illegal activity within the meaning of the illegal act exclusion because the failure to maintain liability insurance was not criminal in nature and had no causal connection with the accident or the injuries Katelynn sustained. The plaintiffs requested that the Plan reverse the denial of the claims; provide the plaintiffs with copies of all documents, records, and other information relevant to the denial of the claims; and produce any rule, guideline, protocol, or similar criterion that was relied upon in making the adverse determination. The plaintiffs attached as an exhibit a Safe Auto Insurance Company (Safe Auto) policy declarations page, purportedly issued on August 2, 2016, indicating Jeffery had liability insurance on two vehicles from November 3, 2015, through May 3, 2016, and that Katelynn was an authorized driver of those vehicles.

¶ 15    The administrative record, however, also includes documents obtained by MCA purporting to be from Safe Auto indicating that Jeffery received an automobile liability insurance policy from Safe Auto beginning on November 3, 2015, but that this policy was cancelled on December 3, 2015, for nonpayment of the premium. It is unclear from the record when these documents were obtained by MCA.

¶ 16    The administrative record shows that MCA received the plaintiffs' appeal on August 25, 2016. On that date, Marasco made a notation in MCA's records that a letter was received from an attorney and, per Dickson, the letter was scanned and sent to "Russ to handle [the] case." On August 29, 2016, Marasco e-mailed Russ Bowman, an attorney, advising him that Dickson wanted Bowman to send a response to the plaintiffs' counsel because Dickson believed the response should come from "the attorney." Bowman e-mailed Marasco advising her that, as a "benefits communication," he did not believe the correspondence to the plaintiffs' counsel "should come from anyone other than the folks who are administering the plan." Bowman offered to review any letter before MCA sent it but reiterated that a "benefits communication" from someone other than the Plan's administrator "could be damaging to the [P]lan." Based on this information, Dickson directed Marasco to draft a letter for Bowman to review. Marasco

then forwarded a letter[2] to Bowman, who approved the letter's contents, suggesting only that Marasco "change in the bolded section 'attempted to commit' and 'or was engaged.' "

¶ 17 On September 1, 2016, MCA sent plaintiffs' counsel a letter denying the plaintiffs' administrative appeal, based on the illegal act exclusion, because Katelynn was driving without automobile insurance at the time of her accident. The letter was signed by Marasco, whose title was "Technical Support." A copy of the letter was sent to Jeffery, but there is no evidence in the record that a copy was sent to Employer.

¶ 18 On October 3, 2016, Jeffery, individually and as natural guardian and next friend of Katelynn, filed a complaint in Madison County, against the Plan, for benefits pursuant to section 1132(a)(1)(B) of the ERISA statute (29 U.S.C. § 1132(a)(1)(B) (2012)). Katelynn was added as a named plaintiff in April 2018, after she obtained the age of majority.

¶ 19 On December 9, 2016, the Plan filed a motion to transfer venue to Williamson County. The circuit court denied the Plan's motion to transfer venue on January 9, 2017. On December 29, 2017, the plaintiffs filed a motion for summary judgment. Shortly thereafter, on January 2, 2018, the Plan filed its motion for summary judgment.

¶ 20 On February 2, 2018, the circuit court held a hearing on the parties' cross-motions for summary judgment. Reviewing the administrative appeal decision *de novo*, the circuit court found the illegal act exclusion to be ambiguous. The court construed the ambiguity against the Plan and found the Plan's interpretation of the exclusion to be unreasonable. The court concluded the illegal act exclusion was not applicable to the claims submitted in connection with Katelynn's accident and entered an order in favor of the plaintiffs. The court also found the plaintiffs were entitled to prejudgment interest and reasonable attorney fees and costs. The court ordered the plaintiffs to submit documentation to the court regarding damages and attorney fees within 28 days. On February 28, 2018, the Plan filed an appeal of the circuit court's grant of summary judgment in favor of the plaintiffs, which this court docketed as appeal No. 5-18-0138.

¶ 21 On March 2, 2018, the plaintiffs filed a motion to quantify attorney fees and costs and for entry of a final judgment. The plaintiffs asserted that the amount of medical benefits wrongly denied by the Plan was $1,065,014.63, based on the amount of unpaid, billed charges, as reflected in the explanation of benefits (EOB) issued by the Plan, and attached as exhibits. Applying a 3.75% interest rate, the plaintiffs requested $30,174.19 in prejudgment interest, for a total of $1,095,188.82. The plaintiffs' counsel also requested the court award $312 in costs and $365,062.70 in attorney fees, based on their acceptance of the case on a contingency fee of one-third of any recovery. Counsel attached an affidavit and exhibits demonstrating that they had taken the case on a contingency basis and that they had expended 107 hours pursuing the case.

¶ 22 On April 9, 2018, the Plan filed its opposition to the plaintiffs' motion to quantify. The Plan maintained that the denied claims must be remanded back to the Plan for processing of the claims, without consideration of the exclusion. Alternatively, the Plan argued that the plaintiffs' benefits' calculation was incorrect, as it failed to account for duplicate claims; claims paid by the Plan and by Medicaid; and existing provider agreements and network affiliations allowing for discounted amounts due to the providers. The Plan asserted that based on records maintained by MCA, the outstanding benefits due were $236,622.10. In support of

---

[2]The letter sent by Marasco to Bowman was not included in the record.

its calculation, the Plan attached a spreadsheet with a table, listing the claims that had actually been billed, along with a column of "repricing," with no explanation of how the Plan was able to recalculate the amount. The Plan also contested the amount of the attorney fees sought by the plaintiffs based on the contingency fee arrangement and challenged the attorneys' reimbursement for services rendered during the administrative review stage. The Plan proposed an attorney fee award of $32,750, based on a lodestar calculation using an hourly rate between $250 and $400.

¶ 23 On April 25, 2018, the circuit court held a hearing on plaintiffs' motion to quantify and took the matter under advisement. On May 18, 2018, the circuit court entered a final judgment. The court rejected the Plan's contention that the amount of damages should be reduced due to potential provider agreements and Medicaid payments because the Plan "failed to produce any evidence of their provider agreements that would allow [the Plan] to reduce payments to some agreed upon discount." The court noted that the Plan failed to present any evidence, including the agreements, testimony, or affidavits, in support of the Plan's assertions that it was entitled to a reduction of the amounts billed. Instead, the Plan produced only a spreadsheet of reduced amounts without any evidentiary explanation. Based on the evidence presented, the court found the amount of benefits denied by the Plan for medical expenses incurred for treatment of Katelynn's injuries related to the February 19, 2016, accident was $1,065.014.63. The court awarded $30,173.49 in prejudgment interest, for a total award of damages of $1,095,188.13. The court also awarded the plaintiffs $312 in costs. In determining the proper amount of the attorney fees, the court rejected the plaintiffs' request to award a percentage of the benefits recovered and, instead, applied the lodestar method, with a fee enhancement (multiplier) to account for the contingency agreement. The court applied an hourly rate of $600 to the 107 hours expended, resulting in $64,200. The court found the plaintiffs met the conditions justifying a fee enhancement, applied a 67% multiplier, and entered an award of $107,214 in attorney fees. In sum, the court entered an order in favor of the plaintiffs and against the Plan for $1,202,714.12.

¶ 24 The Plan filed a motion for reconsideration, which the court denied on July 13, 2018. On August 2, 2018, in appeal No. 5-18-0377, the Plan appealed from the circuit court's entry of the final judgment. On August 31, 2018, this court entered an order consolidating the Plan's two appeals.

¶ 25 ANALYSIS
¶ 26 I. Venue
¶ 27 The plaintiffs filed their action to recover benefits in the Madison County circuit court. In the complaint, the plaintiffs alleged that venue was proper in Madison County because, "on information and belief, the Plan does business in this County." The plaintiffs attached a copy of the Plan document to the complaint. Article 2.02 of the Plan document identified Employer as the Plan sponsor, administrator, and named fiduciary and indicated that Employer was located in Marion, Illinois. Articles 6.08 and 6.13 of the Plan document, however, also identified the Employer as the Plan administrator but indicated it was located in Beckley, West Virginia.

¶ 28 The Plan filed an unverified motion to transfer venue from Madison County to Williamson County. The Plan argued that the general venue statute (735 ILCS 5/2-101 (West 2016)) applied to this case and that, pursuant to 29 U.S.C. § 1132(e)(2), an action against an ERISA

employee welfare benefit plan could only be brought where the plan is administered. The Plan denied doing business in, or having any connection to, Madison County and cited to article 2.02 of the Plan document, alleging that the Plan was administered in Marion, Illinois, which is located in Williamson County. The plaintiffs did not file a response to the Plan's motion to transfer venue.

¶ 29    On January 9, 2017, the circuit court entered its order denying the Plan's motion to transfer venue. The court found the Plan failed to meet its burden of proving that venue was improper because the Plan failed to present any evidence that it was not "doing business" in Madison County, as defined by section 2-102(a) of the Code of Civil Procedure (735 ILCS 5/2-102(a) (West 2016)).

¶ 30    A plaintiff is not required to plead and prove that his venue selection is proper. *Weaver v. Midwest Towing, Inc.*, 116 Ill. 2d 279, 285 (1987) (citing *Hines v. Dresser Industries, Inc.*, 137 Ill. App. 3d 7, 12 (1985)). As the movant, the Plan had the burden of proving that the plaintiffs' selection of venue was improper. *Weaver*, 116 Ill. 2d at 285. To do so, the movant was required to set forth specific facts, not conclusions, and show a clear right to relief. *Weaver*, 116 Ill. 2d at 285. Any doubts arising from the inadequacy of the record are resolved against the movant. *Weaver*, 116 Ill. 2d at 285.

¶ 31    The general venue statute (735 ILCS 5/2-101 (West 2016)) provides in pertinent part:

"Except as otherwise provided in this Act, every action must be commenced (1) in the county of residence of any defendant who is joined in good faith and with probable cause for the purpose of obtaining a judgment against him or her and not solely for the purpose of fixing venue in that county, or (2) in the county in which the transaction or some part thereof occurred out of which the cause of action arose."

¶ 32    Section 2-102 of the Code of Civil Procedure (735 ILCS 5/2-102 (West 2016)) defines the "[r]esidence" of corporations, voluntary unincorporated associations, and partnerships for purposes of venue. In this case, the circuit court relied upon section 2-102(a), defining the residence of a corporation, in denying the Plan's motion. This section provides that "[a]ny private corporation *** organized under the laws of this State *** is a resident of any county in which it has its registered office or other office or is doing business." 735 ILCS 5/2-102(a) (West 2016).

¶ 33    In its first point on appeal, the Plan argues the circuit court erred in relying on section 2-102(a) in denying the Plan's motion to transfer venue because the Plan is not a private corporation. Instead, the Plan argues that the general venue statute, section 2-101, applies and that the federal venue statute, 29 U.S.C. § 1132(e)(2), dictates that an employee welfare benefit plan may only be sued where it is administered.

¶ 34    While we agree with the Plan that venue in this case is dictated by the general venue statute, section 2-101, and that the corporate venue statute, section 2-102, is inapplicable, the Plan may still not prevail. It is unclear why the circuit court relied upon the definition of a corporation's residence in concluding that venue was proper in Madison County because there is no evidence or allegation in the record that the Plan was a corporation organized under Illinois law. Therefore, it is clear the circuit court erred in relying on section 2-102 in denying the Plan's motion to transfer venue. As explained further hereafter, the trial court's error is not determinative of the Plan's position.

¶ 35    The Plan's position in the circuit court and on appeal is that venue is only proper in Williamson County because 29 U.S.C. § 1132(e)(2) dictates that an employee welfare benefit plan can only be sued where it is administered. The Plan's reliance on section 1132(e)(2), the federal venue statute, is misplaced. Section 1132(e)(2) states as follows:

> "Where an action under this subchapter is brought in a district court of the United States, it may be brought in the district where the plan is administered, where the breach took place, or where a defendant resides or may be found, and process may be served in any other district where a defendant resides or may be found." 29 U.S.C. § 1132(e)(2).

¶ 36    As the plain language of the statute indicates, it governs venue only in actions "brought in a district court of the United States." See 29 U.S.C. § 1132(e)(2); see also *Heft v. AAI Corp.*, 355 F. Supp. 2d 757, 772 (M.D. Pa. 2005) (provision prescribes the district in which an action may be brought and pertains only to cases commenced in the federal courts). The plaintiffs brought their case in state court. Therefore, the federal venue statute is inapplicable.

¶ 37    Even if the federal venue statute was pertinent, the Plan misrepresents the statute. The Plan repeatedly asserts that section 1132(e)(2) states that an employee welfare benefit plan may only be sued where it is administered. This is patently untrue. Section 1132(e)(2) clearly provides that an action may be brought "where the plan is administered, where the breach took place, or where a defendant resides or may be found." 29 U.S.C. § 1132(e)(2). The Plan has provided no compelling argument as to why it believes the federal venue statute dictates venue in this state court action and, even if it were applicable, has never explained why it believes only a portion of the federal statute is relevant. Simply put, the Plan has provided no explanation or argument as to why the Plan, as a defendant, does not reside in or may not be "found" in Madison County. See *Varsic v. United States District Court for the Central District of California*, 607 F.2d 245, 247-50 (9th Cir. 1979) (rejecting the argument that an unincorporated pension fund can only be sued where it is administered under application of the four venue alternatives in section 1132(e)(2) and applying a minimum contacts analysis on the question of whether a defendant can be "found" in a particular venue).

¶ 38    Furthermore, the Plan's contention that the Plan document conclusively demonstrate that the Plan was administered in Williamson County is incorrect. The Plan document provided two different addresses for the Plan administrator, one address in Marion, Illinois, and another in Beckley, West Virginia. The Plan presented no evidence or explanation as to this discrepancy in the Plan document.

¶ 39    The record shows that the Plan failed to meet its burden of demonstrating that the plaintiffs' venue selection was improper and that the Plan had a clear right to transfer the action to Williamson County. We find no error in the circuit court's denial of the Plan's motion to transfer venue.

## II. Summary Judgment

¶ 40

¶ 41    A. *Standard of Review Applicable to the Decision to Deny Benefits*

¶ 42    Our review of the circuit court's grant of summary judgment in favor of the plaintiffs begins with whether the circuit court applied the proper legal standard in reviewing the Plan's denial of benefits. We review *de novo* the circuit court's determination as to the proper standard

to apply on review of the Plan administrator's decision. *Hoover v. Provident Life & Accident Insurance Co.*, 290 F.3d 801, 807 (6th Cir. 2002).

¶ 43 Judicial review of an administrator's denial of benefits challenged under section 1132(a)(1)(B) is *de novo* unless the benefit plan gives the administrator or fiduciary discretionary authority to determine eligibility for benefits or to construe the terms of the plan. *Firestone Tire & Rubber Co. v. Bruch*, 489 U.S. 101, 115 (1989). If the plan expressly grants the administrator such discretion, the denial of benefits is reviewed under the highly deferential arbitrary and capricious standard of review. *Shelby County Health Care Corp. v. Majestic Star Casino, LLC*, 581 F.3d 355, 365 (6th Cir. 2009).

¶ 44 "Nonetheless, even when the plan documents confer discretionary authority on the plan administrator, when the benefits decision 'is made by a body other than the one authorized by the procedures set forth in a benefits plan,' federal courts review the benefits decision *de novo*." *Shelby County Health Care Corp.*, 581 F.3d at 365 (quoting *Sanford v. Harvard Industries, Inc.*, 262 F.3d 590, 597 (6th Cir. 2001)). When a plan administrator does not make the benefits determination, the administrator has not exercised its discretionary authority, and therefore, a deferential standard of review is not justified. *Shelby County Health Care Corp.*, 581 F.3d at 365.

¶ 45 The relevant terms of the Plan are not in dispute. The parties agree that the Plan document gave the Plan administrator discretionary authority to determine the eligibility of benefits and to construe and interpret the terms of the Plan. The Plan administrator also had the authority to "appoint and supervise a third-party administrator to pay claims." The Plan administrator exercised this authority, and MCA was named in the Plan document as the third-party administrator tasked with providing "certain claims processing and other technical services." The Plan document specifically provided that MCA "is not a fiduciary of the Plan and does not have the authority to make decisions involving the use of discretion." While the presence of these provisions was not in dispute, the parties disagree over whether the Plan has forfeited the right to deferential review by delegating its discretionary authority to MCA.

¶ 46 The Plan contends that it did not forfeit the right to deferential review for several reasons. First, it argues that decisions made by an agent of the Plan administrator, in this case by MCA as a nonfiduciary claims advisory agent, are decisions of the Plan administrator, which are entitled to the same discretion provided to the administrator. In support of this position, the Plan cites to 29 U.S.C. § 1105(c)(1)(B) (2012) and *Geddes v. United Staffing Alliance Employee Medical Plan*, 469 F.3d 919 (10th Cir. 2006).

¶ 47 Under ERISA, every employee benefit plan shall be established and maintained pursuant to a written instrument. 29 U.S.C. § 1102(a)(1) (2012); *Madden v. ITT Long Term Disability Plan for Salaried Employees*, 914 F.2d 1279, 1283 (9th Cir. 1990). The plan document must provide for one or more named fiduciaries who jointly or severally have authority to control and manage the operation and administration of the plan. 29 U.S.C. § 1102(a)(1); *Madden*, 914 F.2d at 1283. The term " 'named fiduciary' " has a specific meaning under ERISA and is defined as "a fiduciary who is named in the plan instrument or who, pursuant to a procedure specified in the plan, is identified as a fiduciary" by an employer or employee organization. 29 U.S.C. § 1102(a)(2).

¶ 48 Section 1105(c) of ERISA (29 U.S.C. § 1105(c)) governs the allocation and delegation of fiduciary responsibilities to the plan. Section 1105(c)(1) provides that the plan document "may expressly provide for procedures (A) for allocating fiduciary responsibilities *** among

named fiduciaries, and (B) for named fiduciaries to designate persons other than named fiduciaries to carry out fiduciary responsibilities *** under the plan." 29 U.S.C. § 1105(c)(1). Thus, this section allows the named fiduciaries to (1) *allocate* fiduciary responsibilities among the fiduciaries named in the Plan document, per subsection (c)(1)(A), or (2) *designate* persons not named in the Plan document to perform fiduciary acts, per subsection (c)(1)(B).

¶ 49 Here, the Plan is operating under the impression that 29 U.S.C. § 1105(c)(1)(B) allows a named fiduciary to designate nonfiduciaries, such as MCA, to carry out the Plan's fiduciary responsibilities. While the *Geddes* decision (469 F.3d at 924-27) may be read to have interpreted section 1105(c)(1)(B) to allow such a delegation, we believe such an interpretation is not supported by the language of section 1105(c)(1)(B) and is contrary to other ERISA provisions and precedent.[3]

¶ 50 Again, section 1105(c)(1)(B) states that a plan instrument may provide for procedures "for named fiduciaries to designate persons other than named fiduciaries to carry out fiduciary responsibilities *** under the plan." 29 U.S.C. § 1105(c)(1)(B). By its terms, this provision allows *named fiduciaries* to delegate their fiduciary responsibilities to persons who are *not named fiduciaries*. Although the plain language of this provision does not clearly indicate whether the delegee must be a fiduciary of the plan, other ERISA provisions make it clear that a named fiduciary can only delegate its fiduciary duties to other fiduciaries.

¶ 51 Section 1102(c)(2) provides that an employee benefit plan may allow a named fiduciary, "or a *fiduciary designated* by a named fiduciary pursuant to a plan procedure described in section 1105(c)(1) of this title," to employ persons to render advice to the fiduciary. (Emphasis added.) 29 U.S.C. § 1102(c)(2). As already noted, section 1105(c)(1)(A) allows for the allocation of fiduciary responsibilities among named fiduciaries, while section 1105(c)(1)(B) provides for the *designation* of fiduciary responsibilities to third parties. Thus, section 1102(c)(2) contemplates that the person *designated* under section 1105(c)(1)(B) be a fiduciary.

¶ 52 The Plan's interpretation of section 1105(c)(1)(B) is also in direct conflict with 29 U.S.C. § 1002(21)(A) (2012), which defines a fiduciary under ERISA. Section 1002(21)(A) provides that a person is a fiduciary to a plan "to the extent" he or she "exercises any discretionary authority or discretionary control respecting management" of the plan or "has any discretionary authority or discretionary responsibility in the administration of such plan." 29 U.S.C. § 1002(21)(A). In no uncertain terms, section 1002(21)(A) further states that "[s]uch term includes any person designated under section 1105(c)(1)(B) of this title." 29 U.S.C. § 1002(21)(A).

¶ 53 Our conclusion that section 1105(c)(1)(B) requires the delegee to be a fiduciary of the Plan is also supported by precedent. In *Madden*, 914 F.2d at 1283-84, the Ninth Circuit examined the proper standard of review when a named fiduciary delegates its discretionary authority to another person pursuant to section 1105(c)(1)(B). The court held that when the ERISA plan expressly gives the administrator or fiduciary discretionary authority to determine eligibility for benefits or to construe the terms of the plan and, pursuant to 29 U.S.C. § 1105(c)(1)(B), the

---

[3]Notably, although *Geddes*, 469 F.3d at 924-27, concluded that a named fiduciary may delegate its fiduciary responsibilities to nonfiduciaries and maintain a deferential standard of review, the court ultimately concluded discretion was "exercised by some combination of the fiduciary and its agent" because the named fiduciary accepted the third-party administrators benefits determination (*Geddes*, 469 F.3d at 926). Thus, we find *Geddes* distinguishable from the facts herein.

"named fiduciary properly designates *another fiduciary, delegating its discretionary authority*," the arbitrary and capricious standard of review applies to decisions rendered by the designated fiduciary, as well as to the named fiduciary. (Emphasis added.) *Madden*, 914 F.2d at 1283-84.

¶ 54     In light of this precedent, we find that a named fiduciary of an ERISA plan can only delegate its fiduciary responsibilities to another fiduciary under 29 U.S.C. § 1105(c)(1)(B).[4] Because the Plan document here specifically states that MCA is not a fiduciary to the Plan and that it does not have discretionary authority, the Plan administrator, as the named fiduciary, could not have properly delegated its fiduciary responsibilities, including the making of discretionary determinations as to a claimant's entitlement to benefits and interpreting the terms of the Plan, to MCA.[5]

¶ 55     Even if the Plan's interpretation of section 1105(c)(1)(B) is correct and the Plan administrator could delegate its fiduciary responsibilities to a nonfiduciary, section 1105(c)(1)(B) requires the Plan document to "expressly provide for procedures" allowing the administrator, as the named fiduciary, to designate someone other than itself to carry out its fiduciary responsibilities under the Plan. The Plan, however, fails to point this court to any language in the Plan document expressly allowing Employer, as the Plan administrator and named fiduciary, to delegate its fiduciary responsibilities to "persons other than named fiduciaries." Instead, the Plan document specifically states that MCA provides only "certain claims processing" and that MCA "is not a fiduciary of the Plan and does not have the authority to make decisions involving the use of discretion." To accept the Plan's position and endow MCA with fiduciary and discretionary powers it does not possess, simply because it is an agent of the Plan administrator, is contrary to the plain language of the Plan document and the limited agency it bequeathed to MCA. Based on the foregoing, we find that the Plan administrator and named fiduciary could not, and did not, delegate its fiduciary responsibilities to MCA, including the making of discretionary determinations as to a claimant's entitlement to benefits and interpreting the terms of the Plan.

¶ 56     Next, the Plan asserts that it was Employer, as the Plan administrator, and not MCA, who made the eligibility determination in this case. In support of this assertion, the Plan points to the affidavit of Paul B. Piccolini, an employee of Employer's parent company, who was charged with managing the Plan. The affidavit indicates that on March 17, 2016, MCA consulted with Piccolini about the denial of Katelynn's claims and that Piccolini approved the denial of the claims based on the Plan's illegal act exclusion. The Plan further observes that the Employer received copies of the letters MCA sent to the providers denying coverage and that those letters included language indicating that MCA's sole function as the third-party

---

[4]Our holding does not prevent a plan fiduciary from employing third parties to assist them in the administration of the plan or in fulfilling their fiduciary duties. As already noted, section 1102(c)(2) allows for this by providing that named fiduciaries and fiduciaries designated by named fiduciaries "may employ one or more persons to render advice with regard to any responsibility such fiduciary has under the plan." 29 U.S.C. § 1102(c)(2). While a plan fiduciary may seek advice from nonfiduciaries, they may not abdicate their fiduciary responsibilities to a nonfiduciary, especially if the plan fiduciary wants to retain the deferential standard of review.

[5]As previously noted, nothing would have prevented the Plan from seeking the advice of MCA and then acting upon that advice independently as the fiduciary.

administrator was "to process Plan benefits using the language and provisions as provided by the Plan."

¶ 57    There are several problems with the Plan's claim that Employer made the decision regarding the eligibility of benefits in this case. First, the fact that MCA included the same boilerplate language in each of the denial of benefits letters, indicating that MCA was only a claims processor, is not proof that MCA did not make the benefits determination. Instead, as discussed below, the evidence in the record demonstrates that MCA acted outside of its authority despite this boilerplate language.

¶ 58    Next, the Plan has presented no evidence suggesting that Employer, as the Plan administrator, or that any other duly appointed fiduciary, reviewed and ruled upon the plaintiffs' appeal of the initial denial of benefits. Both the denial of benefit letters and the affidavit of Piccolini address only the initial adverse benefits determination. The plaintiffs filed their appeal of the adverse benefits determination on August 24, 2016. After MCA received the plaintiffs' appeal, Dickson, one of the MCA employees involved in the initial adverse benefit determination, promptly directed that the plaintiffs' appeal be denied. All the evidence in the record indicates that it was MCA, not the Plan administrator or a Plan fiduciary, that reviewed and denied the plaintiffs' appeal. There is no evidence in the record demonstrating that the Plan administrator was even aware of the plaintiffs' appeal, let alone that the administrator took any part in the decision to deny it.

¶ 59    Based on the foregoing, we find the Plan has failed to meet its burden of proving that deferential review should apply to the decision denying the plaintiffs' claims for benefits. The circuit court did not err in reviewing the administrative decision denying benefits *de novo*.

¶ 60                            B. *Whether the Illegal Act Exclusion Bars*
                            *Coverage for Katelynn's Claims*

¶ 61    Having ascertained the correct standard of review, we now move to the question of whether the circuit court erred in reversing the Plan's denial of healthcare benefits. On appeal, this court reviews *de novo* the circuit court's judgment on the administrative record regarding the denial of benefits. *Shelby County Health Care Corp.*, 581 F.3d at 367-68. Under *de novo* review, the court reviews the denial of benefits to determine if the administrator made the correct decision. *Hoover*, 290 F.3d at 808-09; *Shelby County Health Care Corp.*, 581 F.3d at 368. The court renders an independent decision. *Dorris v. Unum Life Insurance Co. of America*, 949 F.3d 297, 303-04 (7th Cir. 2020). The administrator's decision is accorded no deference or presumption of correctness. *Hoover*, 290 F.3d at 808-09. The plaintiffs had the burden of proving they were entitled to benefits, so any gaps in the record are construed against their claims. *Dorris*, 949 F.3d at 304. Reviewing the Plan's denial of benefits under the *de novo* standard, it is clear the Plan's determination was incorrect.

¶ 62    The Plan denied the claims for injuries Katelynn sustained as a result of the motor vehicle accident based on the illegal act exclusion in the Plan document. The illegal act exclusion provides that the Plan does not cover any charge for care, supplies, or services "[t]hat are to treat Injuries sustained or a Sickness contracted while the participant committed or attempted to commit a felony or misdemeanor, or was engaged in an illegal occupation or activity." The circuit court found the illegal act exclusion was ambiguous and construed the language against the Plan, as the drafter of the provision.

¶ 63    The parties' disagreement as to the interpretation of this exclusion involves two issues, the meaning of the word "while" and the meaning of the phrase "illegal activity." The Plan contends the exclusion is unambiguous and, by its clear language, excludes coverage for any injury that is sustained at the same time the participant is engaged in an activity prohibited by any law. The Plan position is that Katelynn's injuries are not covered by the Plan because they were sustained "while" she was "engaged in an illegal *** activity," in that she was injured while driving a car without automobile liability insurance. The plaintiffs contend that the exclusion requires a causal nexus between the injury and the illegal activity and that the phrase "illegal activity" is ambiguous.

¶ 64    When interpreting a plan governed by ERISA, federal common law principles of contract interpretation apply. *Sellers v. Zurich American Insurance Co.*, 627 F.3d 627, 632 (7th Cir. 2010). As such, the plan terms must be assigned their plain and ordinary meaning. *Hodges v. Life Insurance Co. of North America*, 920 F.3d 669, 680 (10th Cir. 2019). We use an objective standard, interpreting the policy language as would a reasonable person of average intelligence and experience. *Sellers*, 627 F.3d at 632; *Hodges*, 920 F.3d at 680-81.

¶ 65                              1. The Meaning of the Phrase "Illegal Activity"

¶ 66    First, we address the question of whether the phrase "illegal activity" is ambiguous. The plaintiffs maintain that the phrase "illegal activity" is subject to multiple interpretations and that no participant could reasonably anticipate the Plan's irrational construction of encompassing any activity contrary to law, irrespective of the level of wrongdoing.

¶ 67    Although we are sympathetic to the plaintiffs' position, the Seventh Circuit rejected a similar argument in *Tourdot v. Rockford Health Plans, Inc.*, 439 F.3d 351, 354 (7th Cir. 2006). In *Tourdot*, the court held that the phrase " 'illegal acts' " was unambiguous and that its plain meaning refers to "any activity contrary to law." *Tourdot*, 439 F.3d at 354.

¶ 68    Driving an automobile without liability insurance is contrary to Illinois law. 625 ILCS 5/3-707(a) (West 2016) (no person shall operate a motor vehicle unless covered by a liability insurance policy). Although a violation of section 3-707(a) is a petty offense, punishable by a fine of $500 to $1000 (625 ILCS 5/3-707(c) (West 2016)), *Tourdot* rejected the proposition that the severity of the wrongdoing or the nature of the penalty transformed "the essential nature" of the act as being contrary to law. *Tourdot*, 439 F.3d at 354. Therefore, the Plan is correct that Katelynn was "engaged" in an "illegal *** activity" by driving an automobile without liability insurance at the time she sustained her injuries.

¶ 69                              2. Whether a Causal Nexus Is Required

¶ 70    Next, the Plan insists there does not need to be a causal nexus between the illegal activity and the injuries sustained because the Plan document excludes coverage for injuries sustained "while *** engaged in an illegal *** activity." The Plan maintains that "while" requires only a temporal connection, not a causal connection, between the illegal activity and the injuries. The Plan attempts to distinguish caselaw supporting the requirement of a causal nexus when the Plan language exclude injuries "arising out of" or "due to" or "resulting from" the illegal activity, but the Plan has failed to cite a single case in its brief supporting its claim that a causal nexus is not necessary.

¶ 71    In *Sisters of the Third Order of St. Francis v. SwedishAmerican Group Health Benefit Trust*, 901 F.2d 1369 (7th Cir. 1990), the Seventh Circuit addressed the interpretation of the word "while" in an illegal activity exclusion clause contained in an ERISA plan. In that case, a participant of an employee welfare benefit plan was driving legally intoxicated when he was injured in a single-car motor vehicle accident. *Sisters of the Third Order of St. Francis*, 901 F.2d at 1370. The plan refused to pay the medical benefits claims based on an exclusion for " 'expenses incurred . . . [w]hile engaged in any illegal or criminal enterprise or activity.' " *Sisters of the Third Order of St. Francis*, 901 F.2d at 1370. The district court granted summary judgment in favor of the plan, based, in part, on the finding that "while engaged in" comprised "as a result of." *Sisters of the Third Order of St. Francis*, 901 F.2d at 1372. On appeal, the Seventh Circuit agreed, finding the structure of the plan demonstrated that its drafters used "while" to include "as a result of." *Sisters of the Third Order of St. Francis*, 901 F.2d at 1372-73.

¶ 72    Here, the Plan invokes a narrow reading of the term "while" in order to more broadly exclude coverage for any injuries related to an illegal activity. The Plan's interpretation of this exclusion opens the door to a denial of coverage of any number of injuries that happen to coincide with any knowing or unknowing violation of any law, including infractions and ordinance violations. See *Bekos v. Providence Health Plan*, 334 F. Supp. 2d 1248, 1256-57 (D. Or. 2004) (finding a reasonably intelligent person objectively examining the "other illegal act" phrase in the context of the entire exclusion would not expect a denial of coverage for injuries that happen to coincide with minor traffic infractions or permit violations). Without a causal connection, the exclusion yields absurd results and renders a meaning contrary to that expected by a reasonable person of average intelligence and experience. See *Sellers*, 627 F.3d at 632; *Hodges*, 920 F.3d at 680-81. Based on the exclusion as a whole, we find that the Plan's argument to exclude coverage for injuries sustained "while *** engaged in an illegal *** activity" requires a showing of a causal nexus between the illegal activity and the injuries for which the benefits are claimed.

¶ 73    In actions seeking benefits under an ERISA plan, the plaintiff bears the burden of proving the beneficiary's entitlement to the benefits of the insurance coverage, and the insurer bears the burden of establishing the beneficiary's lack of entitlement. *Diaz v. Prudential Insurance Co. of America*, 499 F.3d 640, 643 (7th Cir. 2007); *Smathers v. Multi-Tool, Inc./Multi-Plastics, Inc. Employee Health & Welfare Plan*, 298 F.3d 191, 200 (3d Cir. 2002) (the insurer must present facts that bring a loss within an exclusionary clause of a policy). There is no evidence in the record suggesting that Katelynn's motor vehicle accident and the injuries sustained during the accident were caused by Katelynn's act of driving without liability insurance. As such, the Plan has failed to demonstrate that Katelynn's claims related to her February 19, 2016, automobile accident fall within the Plan's illegal act exclusion. The circuit court did not err in reversing the Plan's denial of Katelynn's claims for benefits.

¶ 74                              III. Calculation of Denied Benefits

¶ 75    On February 2, 2018, the circuit court entered summary judgment in favor of the plaintiffs, finding the illegal act exclusion was not applicable to the claims submitted in connection with Katelynn's accident. The court ordered the plaintiffs to submit documentation to the court regarding the medical bills and attorney fees within 28 days of the judgment. On March 2, 2018, the plaintiffs filed their motion to quantify attorney fees and costs and for entry of a final

- 14 -

judgment. In their motion, the plaintiffs asserted the amount of medical benefits wrongly denied by the Plan was $1,065,014.63, based on the amount of unpaid billed charges as reflected in the EOBs issued by the Plan. The plaintiffs attached the EOBs to their motion as exhibits.

¶ 76    On April 9, 2018, the Plan filed its opposition to the plaintiffs' motion to quantify. The Plan requested the court remand the claims to the Plan for processing. Alternatively, the Plan contested the plaintiffs' benefit calculation. The Plan asserted that the outstanding benefits due amounted to $236,622.10, after consideration of duplicate claims, claims already paid by the Plan and Medicaid, and provider agreements and network affiliations. The Plan attached an unverified letter from an MCA employee attesting that the "information" he provided to the Plan's counsel "via electronic transmission" was "collected using information obtained through the benefit administration" of the Plan and was accurate to the best of his knowledge. The letter indicated that the "summarized information was in part assembled from submitted claims and statements from healthcare providers and a State Medicaid agency." The Plan also attached a spreadsheet with a table totaling some of the billed claims. This table includes columns listing the provider, the date of service, the claim number, the amount billed, a "repricing" amount, and a total amount of $236,622.10. The spreadsheet also includes three additional tables grouping (1) services provided by the "Illinois Department of HealthC" totaling $202,108.44; (2) a list of providers, service dates, and dollar amounts under the heading "Taken Off Master For Final Send Sheet" but no total amount; and (3) an untitled list of providers, dates, and dollar amounts but no total amount.

¶ 77    On April 18, 2018, the plaintiffs filed a response to the Plan's opposition, arguing that the Plan failed to present any evidence supporting the Plan's benefit calculation, including any evidence demonstrating the amount of reductions based on the alleged provider and network agreements.On April 25, 2018, the circuit court held a hearing on the plaintiffs' motion to quantify. At the hearing, the court asked the Plan to respond to the allegation that the Plan had failed to introduce evidence proving it was entitled to any provider and network reductions. The Plan responded that "those agreements are confidential and have nothing to do with the plaintiff."

¶ 78    On May 18, 2018, the circuit court entered a final judgment awarding the plaintiffs $1,065,014.63 in unpaid benefits, based on the amounts billed, as evidenced by the EOBs issued by the Plan. The court rejected the Plan's request to reduce the amount requested in consideration of potential provider agreement discounts because the Plan "failed to produce any evidence of their provider agreements that would allow [the Plan] to reduce payments to some agreed upon discount." The court observed that the Plan did not produce any evidence of the provider agreements, be it copies of the agreements or testimony and affidavits regarding the agreements. The court found the spreadsheet submitted by the Plan was without evidentiary explanation and that absent adequate proof to justify an alternative calculation, the plaintiffs were entitled to the full amount of the bills represented by the facts submitted by plaintiffs.

¶ 79    On June 15, 2018, the Plan filed a motion for reconsideration of the circuit court's judgment, arguing the amount of the award should be reduced based upon the terms of the Plan. The Plan maintained it was entitled to reductions based on coverage level; provider network status; the lifetime maximum of benefits; and the exclusion of benefits for any amounts over the usual, customary, and reasonable fees. On July 13, 2018, the circuit court held a hearing on the Plan's motion for reconsideration and entered an order denying the Plan's

motion. At the hearing, the court acknowledged that the Plan may have been entitled to discounts under the provider agreements but reiterated that the Plan failed to present any evidence supporting the amount of the alleged discounts.

¶ 80    On appeal, the Plan contends the circuit court erroneously "approached" the quantification of benefits, treating it like a calculation of damages on a contract claim instead of a calculation of benefits due under the terms of the Plan. The Plan argues the circuit court was required to either (1) enter an order directing the Plan to process the previously denied claims submitted by the plaintiffs' providers or (2) make a determination of the benefits that were "actually due under the terms of the Plan based on the pricing information provided by the Plan and contained in the record."

¶ 81    We review the circuit court's factual findings under a clearly erroneous standard of review. *Michigan Carpenters Council Health & Welfare Fund v. C.J. Rogers, Inc.*, 933 F.2d 376, 385 (6th Cir. 1991). The court's finding is clearly erroneous if, upon review of all the evidence, a reviewing court is left with the definite and firm impression that a mistake has been made. *Locher v. Unum Life Insurance Co. of America*, 389 F.3d 288, 293 (2d Cir. 2004). This standard extends to the court's factual findings based on documentary evidence and inferences drawn from other facts. *Locher*, 389 F.3d at 293.

¶ 82    Here, the circuit court provided the parties with ample opportunity to present the court with evidence and argument supporting their respective calculations as to the amount of benefits due under the Plan. The plaintiffs supported their calculations by submitting the EOBs issued by the Plan. The Plan countered with a substantially lower amount, allegedly based upon MCA's accounting for duplicate claims, paid claims, provider agreements, and network affiliations. In support of its vastly reduced calculation, the Plan attached a spreadsheet with a table of purportedly "repriced" pending claims, and several other tables listing providers, dates, and amounts. The documents provided by the Plan provided absolutely no explanation of how the Plan determined the "repriced" amounts or the purpose and meaning of the other tables included in the spreadsheet.[6]

¶ 83    Prior to the damages hearing, the plaintiffs filed a response to the Plan's opposition, arguing that the documents submitted by the Plan were insufficient to support the Plan's benefit calculation. In response to the court's expressed concerns that the Plan had failed to prove it was entitled to its claimed reductions, the Plan asserted that its providers agreements were "confidential" and irrelevant. Regardless of the confidentiality of these agreements, the Plan failed to provide any form of admissible evidence through affidavits or testimony that would have supported its reduced calculation. In determining the amount of damages awarded, the circuit court specifically stated that the Plan had failed to present evidence supporting its position as to the amount of benefits due under the terms of the Plan.

¶ 84    The Plan's request that this court remand the proceeding for the circuit court to calculate the amount of benefits "due under the terms of the plan" is nothing more than a request for a second bite at the apple. Simply stated, the circuit court did not err in failing to properly consider the terms of the Plan in determining the award; instead, the Plan erred in failing to present evidence supporting its position as to the proper calculation of benefits due under the

---

[6]At the hearing, the Plan indicated that payments made by Medicaid were included on the spreadsheet. Presumably, the Plan was referring to the amounts listed with the named provider: "Illinois Department of HealthC."

terms of the Plan. The Plan possessed the information necessary for the circuit court to make the determination the Plan now requests, but the Plan chose not to present this evidence to the court when the opportunity to do so existed. Instead, the Plan elected to present the court with nothing more than an unexplained spreadsheet, supported by an unverified letter, and requested that the court take the Plan at its word that the amount contained therein was accurate. The circuit court was well within its province to reject the Plan's unsupported arguments and calculations. Upon review of the entire record, we find the circuit court's judgment awarding the plaintiffs $1,065,014.63 in unpaid benefits was not clearly erroneous.

¶ 85                                    IV. Attorney Fees

¶ 86    In its final point, the Plan argues the circuit court erred in awarding the plaintiffs $107,214 in attorney fees because the plaintiffs were not entitled to any fees and, alternatively, the amount of fees awarded were unreasonable.

¶ 87    Section 1132(g)(1) of ERISA allows the court, in its discretion, to award a party "a reasonable attorney's fee and costs of action." 29 U.S.C. § 1132(g)(1). The trial court's decision to award attorney fees pursuant to ERISA will not be disturbed on appeal absent an abuse of discretion. *Cress v. Recreation Services, Inc.*, 341 Ill. App. 3d 149, 190 (2003). "The reasonableness of the fees requested and the amount of the fees to be awarded are decisions left to the trial court's discretion." *Cress*, 341 Ill. App. 3d at 192.

¶ 88             A. *The Plaintiffs' Entitlement to an Award of Attorney Fees*

¶ 89    In order to be eligible for a fee award under section 1132(g)(1), the party seeking the attorney fees must have achieved " 'some degree of success on the merits.' " *Hardt v. Reliance Standard Life Insurance Co.*, 560 U.S. 242, 255 (2010). The plaintiffs achieved complete success on the merits, thus meeting the threshold requirement entitling them to an award of their attorney fees.

¶ 90    While the statute vests the circuit court with broad discretion in awarding fees, this discretion is not unlimited. *Hardt*, 560 U.S. at 254-55. Many courts have embraced a five-factor test for whether a court should award attorney fees and costs under section 1132(g)(1). *Prather v. Sun Life & Health Insurance Co. (U.S.)*, 852 F.3d 697, 699 (7th Cir. 2017). These factors include:

> " '(1) the degree of the offending parties' culpability; (2) the degree of the ability of the offending parties to satisfy an award of attorneys' fees; (3) whether or not an award of attorneys' fees against the offending parties would deter other persons acting under similar circumstances; (4) the amount of benefit conferred on members of the pension plan as a whole; and (5) the relative merits of the parties' positions.' " *Prather*, 852 F.3d at 699 (quoting *Raybourne v. Cigna Life Insurance Co. of New York*, 700 F.3d 1076, 1090 (7th Cir. 2012)).

See also *Jackman Financial Corp. v. Humana Insurance Co.*, 641 F.3d 860, 866 (7th Cir. 2011).

¶ 91    The United States Supreme Court has recognized that this five-factor analysis is "not required for channeling a court's discretion when awarding fees" under section 1132(g)(1) because the factors "bear no obvious relation" to the text of the statute or the Court's fee-shifting jurisprudence. *Hardt*, 560 U.S. at 254-55. Nevertheless, some courts, including the

Seventh Circuit, still look to these factors in making their determination. *Hardt*, 560 U.S. at 254-55; *Prather*, 852 F.3d at 699.

¶ 92    In this case, application of the five-factor test readily lends itself to a finding that the circuit court did not abuse its discretion in concluding that an award of the plaintiffs' attorney fees was appropriate. There is no evidence before this court regarding the Plan's ability to pay the award of attorney fees (factor 2) or the amount of benefit the plaintiffs' action conferred on members of the Plan as a whole (factor 4), so those factors are neutral. The record demonstrates, however, that the remaining three factors weigh in favor of an award.

¶ 93    Under the first factor, the degree of the offending parties' culpability, the Plan's actions demonstrate culpable indifference to the plaintiffs' rights as beneficiaries of the Plan. Article 9.02A of the Plan document and 29 U.S.C. § 1133 gave the plaintiffs the right to a full and fair review of any adverse benefit determination. Under the Plan document, this included "a review that does not afford deference to the previous adverse benefit determination and that is conducted by an appropriate named fiduciary of the Plan, who shall be neither the individual who made the adverse benefit determination that is subject of the appeal, nor the subordinate of such individual." The Plan failed to provide plaintiffs with any of these procedural rights. The record plainly shows that employees of MCA, a nonfiduciary with no discretionary authority under the Plan document, did little more than rubber stamp the initial adverse benefit determination, which itself was based on MCA's recommendation to Employer, in denying the plaintiffs' appeal. There is nothing in the record to suggest that Employer took any action on the plaintiffs' appeal in accord with the Plan document. The Plan's complete disregard of the basic procedural safeguards within ERISA and the Plan document with respect to the plaintiffs' appeal of the initial adverse benefit determination demonstrates the Plan's culpable indifference to the plaintiffs' rights.

¶ 94    The fifth factor, the relative merits of the parties' positions, also weighs in favor of an award, as there was little merit to the Plan's position. The Plan's interpretation of the illegal act exclusion was unreasonable and resulted in the Plan's illogical denial of coverage in this case. As the circuit court aptly observed in ruling in favor of the plaintiffs, "[T]o be quite frank[,] this is just absolutely the most ridiculous case I have ever seen on an interpretation and administration of language in an insurance case."

¶ 95    Finally, under the third factor, an award of attorney fees against the Plan is likely to discourage other plan administrators from torturing the terms of a plan beyond rational meaning or from failing to observe the procedural rights of their participants, persons to whom the plan administrators owe a fiduciary duty. See *Prather*, 852 F.3d at 699. Based on the foregoing, we find the circuit court did not err in finding an award of attorney fees in favor of the plaintiffs was appropriate under the circumstances.

¶ 96                    B. *The Amount of Attorney Fees Awarded*

¶ 97    On appeal, the Plan argues the amount of the attorney fees awarded by the circuit court was clearly excessive. Specifically, the Plan contends the circuit court erred by (1) awarding a flat rate of $600 an hour to each of the plaintiffs' attorneys irrespective of their experience level, (2) including time incurred during the administrative review process in the fee award, and (3) applying a 67% multiplier as a fee enhancement based on the contingency agreement between the plaintiffs and their attorneys. While we do not believe the amount of the award was *per se* excessive, some of the issues raised by the Plan have merit.

- 18 -

¶ 98        In the motion to quantify, the plaintiffs sought $365,062.70 in attorney fees based on a one-third contingency fee arrangement the plaintiffs entered into with their attorneys. The plaintiffs attached to their motion several exhibits, including the contingency fee agreements, an affidavit of one of the plaintiffs' counsel setting forth the experience of the three attorneys that worked on the plaintiffs' case, and a spreadsheet detailing the 107 hours worked by the attorneys.

¶ 99        In its opposition, the Plan argued that the lodestar method, not a percentage of the award based on a contingency agreement, must be employed to determine a reasonable fee amount under ERISA. Looking to the experience of each of the plaintiffs' attorneys, as set forth in the affidavit submitted by the plaintiffs, the Plan argued in its motion that a reasonable hourly rate was $250, $350, or $400, based on each of the three attorneys' respective experience. The Plan also argued that the plaintiffs could not recover attorney fees for services rendered between July 20, 2016, and September 1, 2016, during the administrative review stage. Finally, the Plan argued that the court could not apply a fee enhancement to a lodestar award based on a contingency agreement. The plaintiffs filed a response to the Plan's opposition, maintaining that a one-third contingency fee was proper.

¶ 100        At the hearing on the motion, counsel for the Plan stated that the going rate for an attorney specializing in ERISA cases in the Chicago area was in the range of $600 to $750 an hour. On May 18, 2018, the circuit court entered a judgment awarding the plaintiffs $107,214 in attorney fees. In doing so, the court rejected the plaintiffs' request to award a percentage of the benefits recovered and, instead, applied the lodestar method. Based upon the experience of counsel, and the law firm's experience in complex litigation and location in a metropolitan area, the court found a rate of $600 an hour was reasonable for the case. The court applied an hourly rate of $600 to the 107 hours expended, resulting in $64,200 in fees under the lodestar method. Using the contingency agreement for some guidance, the court found a fee enhancement was appropriate, applied a 67% multiplier, and entered an award of $107,214 in attorney fees.

¶ 101        Initially, we find the circuit court did not abuse its discretion in assigning a $600 per hour rate for attorney time. The determination of a reasonable hourly rate is not the rate actually charged, but the prevailing market rate in the community. *United Steelworkers of America v. Retirement Income Plan for Hourly-Rated Employees of ASARCO, Inc.*, 512 F.3d 555, 564 (9th Cir. 2008); see also *Blum v. Stenson*, 465 U.S. 886, 895 (1984) (finding "reasonable fees" under 42 U.S.C. § 1988 (Supp. V 1976) are to be calculated according to the prevailing market rate in the relevant community).

¶ 102        In its motion opposing the plaintiffs' request for attorney fees, the Plan argued the reasonable hourly rate was between $250 and $400. At the hearing, however, the Plan indicated that the going rate for an attorney specializing in ERISA cases in the Chicago area was in the range of $600 to $750 an hour. The plaintiffs' attorneys presented no evidence as to their customary rates or the market rate of an attorney specializing in ERISA in their community.

¶ 103        In determining the reasonable hourly rate, the circuit court used the lowest rate presented by the Plan at the hearing for plaintiffs' attorneys specializing in ERISA actions in the Chicago area. In fixing the rate, the court took into consideration the experience of counsel, the experience and location of the firm, and the market rate in the community. ERISA cases are technically difficult and require expertise not only with federal statutes but with the administrative process as well. Based on the record, we hold the circuit court did not abuse its discretion when it set $600 per hour as a reasonable hourly rate.

¶ 104    We do find, however, that the circuit court erred in allowing the plaintiffs to recover those attorney fees incurred during the administrative review stage. The ERISA civil enforcement provision allows the court to award a reasonable fee, stating, "[i]n any action under this subchapter *** by a participant, beneficiary, or fiduciary, the court in its discretion may allow a reasonable attorney's fee and costs of action to either party." 29 U.S.C. § 1132(g)(1). This provision has been interpreted as only allowing for the recovery of fees incurred to prosecute the civil action and not for fees incurred during the administrative proceedings prior to the civil suit, even though the administrative proceedings are necessary and valuable. *Cann v. Carpenters' Pension Trust Fund for Northern California*, 989 F.2d 313, 316 (9th Cir. 1993); *Dishman v. UNUM Life Insurance Co. of America*, 269 F.3d 974, 987 (9th Cir. 2001); *Anderson v. Procter & Gamble Co.*, 220 F.3d 449, 455-56 (6th Cir. 2000).

¶ 105    That being said, the circuit court may award fees and costs for work that contributes to the prosecution of the action, even if they were incurred prior to the filing date of the action. *Dishman*, 269 F.3d at 987-88; see also *Hedley-Whyte v. Unum Life Insurance Co. of America*, No. CIV. A. 94-11731-GAO, 1996 WL 208492, at *4 n.5 (D. Mass. Mar. 6, 1996) (noting the statutory language suggests a court has discretion to award fees and costs for work contributing to the prosecution of the action even when those fees were incurred prior to the filing date). For example, this may include time spent on conferences with clients, drafting the complaint, and other "reasonable efforts directed toward the filing of the litigation." (Internal quotation marks omitted.) *Dishman*, 269 F.3d at 987-88.

¶ 106    On appeal, the Plan requests this court to vacate the circuit court's order for the 7.3 hours requested by plaintiffs' counsel for services rendered during the administrative review stage between July 10, 2016, through September 1, 2016.[7] While the description of work performed demonstrates that some of this time was spent performing work solely for the administrative proceedings, it is not clear from the record whether all of this time is unrecoverable. The circuit court made no findings on this issue. Therefore, the cause must be remanded for the parties to present evidence and argument as to whether any hours expended by counsel prior to the filing of the civil enforcement action are recoverable and for the circuit court to make appropriate findings.

¶ 107    Finally, the Plan argues the circuit court erred in applying a 67% multiplier as a fee enhancement based on the contingency agreement between the plaintiffs and their attorneys. The Plan acknowledges that a fee enhancement may be appropriate in some cases but contests the multiplier applied in this case and the court's reliance on the existence of a contingency agreement to support the multiplier.

¶ 108    The determination of a reasonable attorney fee begins by calculating the lodestar by multiplying the attorney's reasonable hourly rate by the number of hours reasonably expended. *Schlacher v. Law Offices of Phillip J. Rotche & Associates, P.C.*, 574 F.3d 852, 856 (7th Cir. 2009). The court may then adjust the lodestar figure depending on a number of factors. *Schlacher*, 574 F.3d at 856. There is a strong presumption that the lodestar represents a reasonable fee, and the party seeking the fee has the burden of demonstrating that " 'an adjustment is *necessary* to the determination of a reasonable fee.' " (Emphasis in original.) *City of Burlington v. Dague*, 505 U.S. 557, 562 (1992) (quoting *Blum*, 465 U.S. at 898); see

_____

[7]The Plan actually requests a reduction of 9.3 hours. This appears to be a miscalculation, as the plaintiffs' exhibit demonstrates that counsel expended 7.3 hours on the case during this period.

- 20 -

also *Hensley v. Eckerhart*, 461 U.S. 424, 435 (1983) (an attorney who obtains excellent results for his client is usually fully compensated by the lodestar calculation but enhanced award may be justified in cases of exceptional success).

¶ 109 Factors relevant to determining whether an enhanced fee is appropriate include (1) the time and labor required; (2) the novelty and difficulty of the questions; (3) the skill requisite to perform the legal service properly; (4) the preclusion of employment by the attorney due to acceptance of the case; (5) the customary fee; (6) whether the fee is fixed or contingent; (7) time limitations imposed by the client or the circumstances; (8) the amount involved and the results obtained; (9) the experience, reputation, and ability of the attorneys; (10) the undesirability of the case; (11) the nature and length of the professional relationship with the client; and (12) awards in similar cases. *Hensley*, 461 U.S. at 430 n.3. Notably, some of these factors may be subsumed within the initial lodestar calculation. *Hensley*, 461 U.S. at 434 n.9. Further, an enhancement for contingency is not permitted under federal fee-shifting statutes authorizing a court to award reasonable attorney fees because "an enhancement for contingency would likely duplicate in substantial part factors already subsumed in the lodestar [calculation]." *Dague*, 505 U.S. at 562-63, 566; *Cann*, 989 F.2d at 318 (applying *Dague*, 505 U.S. 557, to the ERISA fee-shifting provision).

¶ 110 Here, the circuit court applied a multiplier to enhance the lodestar calculation based solely on the contingency fee arrangement between the plaintiffs and their counsel. While the court erred in doing so, a fee enhancement may still be appropriate in this case, and we make no finding on whether the amount set by the court was an abuse of discretion. Nevertheless, because the circuit court erred in relying solely on the contingency fee arrangement in setting the fee enhancement multiplier, we must remand this cause to the circuit court so that the parties may present evidence and argument as to the appropriate enhancement factors, and the circuit court's consideration of same.

¶ 111 CONCLUSION

¶ 112 Based on the foregoing, we reverse the circuit court's award of $107,214 in attorney fees in favor of the plaintiffs and remand the cause for a hearing consistent with this opinion, wherein the parties may present additional evidence and argument as to the appropriate amount of attorney fees to be awarded. The judgment of the circuit court is affirmed in all other respects.

¶ 113 Affirmed in part and reversed in part; cause remanded with directions.